**Albert W. Schlaf, Appellant, v. State Farm Mutual Automobile Insurance Company, et al., Defendants below, State Farm Mutual Automobile Insurance Company, Appellee.**

Gen. No. 47,095.

First District, First Division.

October 21, 1957.

Released for publication December 5, 1957.

195

John F. Morrissey, of Chicago, for appellant.

Meyers & Matthias, of Chicago (Donald L. Thompson, of counsel) for appellee.

JUDGE McCORMICK delivered the opinion of the court.

This was an action brought in the Circuit Court of Cook county to recover damages from the State Farm Mutual Automobile Insurance Company, a corporation, for the alleged slander of the plaintiff. Originally the Maryland Casualty Company, David Ducey and Ted Harris were additional defendants, but during the trial of the case on motion of the plaintiff they were dismissed, leaving State Farm Mutual Automobile Insurance Company as the sole defendant. At the conclusion of the plaintiff's evidence the court, upon motion of the defendant, directed the jury to return a verdict of not guilty. From the judgment on the verdict this appeal is taken.

From the record it appears that the plaintiff had been employed as an insurance adjuster and investigator by the defendant. He had the duty, in case of an automobile accident, to determine whether the automobile insured by the defendant could be repaired or was a total loss, and in case he determined that it was a total loss, to sell it as salvage to the highest bidder, obtain the purchase price by check, fill out a salvage form describing the vehicle sold, and thereafter promptly transmit to the defendant the money received from the sale. The plaintiff became an employee of the defendant about February, 1952. On January 14, 1954 he was informed by an agent of the defendant that he was to be discharged and that he could use his own judgment whether he would wait for the discharge or resign. In case of resignation he would receive termination pay. The plaintiff elected to resign. After leaving the defendant's employ the plaintiff went to work for another insurance company

197

in February, 1954, and on May 31, 1954 he started to work for the United States Fidelity and Guaranty Company, at which time he signed an application for a fidelity bond with the Maryland Casualty Company, which bond was required by his employer. The application provided that the applicant should answer fully all questions asked, and that all information received would be used solely by the company in judging the risk and would be treated strictly as confidential. In answer to the questions asked in the application the plaintiff gave the name of the defendant and the time he had been employed with it, and stated he left the company because of "unresolved dispute—working conditions." The application also provided, among other things, "that the Company may decline to become surety for me on the suretyship hereby applied for, or if executed, the Company may at any time cancel or withdraw from the same without giving me reason for such action and that the Company or anyone who has furnished the Company any information concerning my character, habits, ability, financial responsibility, or my reason for leaving any employment, shall not be responsible for any loss or damage that I may suffer in consequence thereof, any statutory provisions to the contrary being hereby expressly waived by me." The application was signed and sealed by the plaintiff.

■ Considering the evidence and all reasonable intendments which can be drawn therefrom in the light most favorable to the plaintiff, it could be found that the Maryland Casualty Company, upon receipt of the plaintiff's application for a fidelity bond, sent their special agent, one Harris, to investigate the plaintiff at the home office of the defendant; that there Harris had an interview with one Cox, who was defendant's divisional manager in charge of northern Illinois, who told Harris that he believed that the plaintiff's deal-

ings on salvage were irregular in that he was selling salvage to one garage at what they believed to be a low priced sale, and that while they could not prove it, they felt there was something going on and as a result they discharged him, and that at the time Cox said that he felt the plaintiff was dishonest. Subsequently the plaintiff by a subterfuge secured the substance of this conversation from Harris. The plaintiff then interviewed Cox, and Cox denied that anyone from their office had talked to anyone concerning the plaintiff.

The plaintiff called as an adverse witness under section 60 of the Civil Practice Act one Matthews, who at the time in question was the home office personnel manager for the defendant in complete charge of personnel, who identified a personnel card index pertaining to the plaintiff, which showed as the reason for the severance of the plaintiff's employment that he could not meet work requirements. Plaintiff called three other employees of the defendant as adverse witnesses, who testified that in their opinion his reputation for honesty was good.

The plaintiff concedes that the statement made by the defendant through its agent Cox to the representative of the bonding company was a qualifiedly privileged communication. To say that a communication is made under a qualified privilege means that the communication was made on such an occasion as rebuts the prima facie inference of malice which otherwise would have arisen from the publication of matters prejudicial to the character of the plaintiff, and it throws upon the plaintiff the burden of proving actual malice or malice in fact. Communications, which otherwise would be defamatory, are so privileged when they are made to another in pursuance of a duty, political, judicial, social or personal, and the duty may be either legal or moral. The communication must be warranted by the occasion and honestly made.

199

Newell on Slander and Libel, 4th Ed., sec. 340; Wharton v. Wright, 30 Ill. App. 343; McDavitt v. Boyer, 169 Ill. 475. Actual malice or malice in fact means ill will towards the particular individual. 54 C. J. S. Malice, p. 917, and cases there cited. A communication respecting the character of a former employee is made under a qualified privilege if made in good faith and by a person having a duty in the premises to one who has a definite interest therein, and the party who makes the statement is not limited to facts within his personal knowledge but may and should pass on to his inquirer all relevant information that has come to him regardless of whether he believes it to be true or not; and this is particularly true when the information is given in response to an inquiry authorized by the employee. 33 Am. Jur. Libel and Slander, sec. 173.

In the case before us, as we have heretofore stated, the parties agree that the communication in question was made under a qualified privilege and that the burden of proving it was actuated by malice in fact rests upon the plaintiff, and the only issue before us is whether or not the plaintiff sustained that burden in the trial court.

The evidence adduced by the plaintiff to prove that Cox was motivated by ill will toward him when he made the statement complained of was that he had first met Cox in 1952 while attending the defendant's claim school at which Cox lectured, and in 1952 he discussed claim files with Cox once a month; that during that period he received no criticism from Cox; that in August of 1953, in connection with a claim for damage to an automobile resulting from a fire, plaintiff received Cox's permission to hire his (plaintiff's) brother, an engineer, to make an investigation of the cause of the fire. The plaintiff mailed the report to Cox and later called Cox, who told him that he would call him back. Cox did not call and the plaintiff again

called him and told him that suit had been filed and that Cox then asked the plaintiff why he had let this happen, and the plaintiff stated that he was waiting for Cox's instructions. Cox thereupon said: "Don't blame this on me; if you do I will get even with you." Again in December of 1953 the plaintiff talked to Cox about his vacation. Cox again referred to the previously discussed case and said: "You know, Schlaf, I could run you right out of the insurance business." That was the last conversation he had with Cox and apparently nothing further developed concerning the claim in question. Plaintiff further testified that on January 14, 1954 he was told by one Kurtock, his superintendent, that Cox had told him (Kurtock) at the home office that he was going to have the plaintiff fired; that after the plaintiff had talked to Harris about the latter's interview with Cox, he (the plaintiff) talked to Cox; that Cox said that he had not talked to anyone concerning the plaintiff; that Cox had plaintiff's file brought into the office and said there was nothing in the file, whereupon Cox wrote a letter to the superintendent of claims of United States Fidelity and Guaranty Company. The letter does not appear in the record.

On cross-examination of plaintiff the defendant went into considerable detail concerning certain claims which plaintiff had handled where the insured's automobile had been determined by plaintiff to be a total loss and where he disposed of the wrecked car as salvage. Three deals were involved. In all three, after the car had been sold through the plaintiff to one Berlin, the car either came into plaintiff's possession or he was involved in its sale to a third party. The transactions engaged in by the plaintiff were somewhat complicated. The plaintiff testified that he made no money on the transactions and that he had never done anything dishonest while in the employ of the

201

defendant. In the last transaction a friend of the plaintiff, one Shaver, purchased through the plaintiff an automobile from an insured for salvage value after the automobile had been determined by the plaintiff to be a total loss and the defendant paid the insured full value for it. Shaver gave the plaintiff a check for $245 made out to Berlin, the repairman who was involved in all of the transactions. Berlin indorsed the check. The plaintiff deposited it in his account or cashed it at his bank and gave Berlin $245 in cash, and the plaintiff received nothing from Berlin for his services in selling the car. The plaintiff said that in his opinion the transaction was "irregular." It is probably an understatement to say that this characterization of the transaction by the plaintiff is a euphemism. With these various transactions before him, Cox's statement to Harris could not be said to exceed a fair appraisal of what he thought about the plaintiff's conduct as an employee of the defendant. Taking the testimony with reference to the salvage transactions in the light most favorable to the plaintiff, they were, to say the least, "irregular."

The statement made by Cox to Harris concerning the defendant fell squarely within the privilege unless the plaintiff has overcome it by proof of malice or ill will on the part of Cox toward him. The statement of Cox, which we must accept as true, that he would get even with plaintiff if the plaintiff put the blame on him, is left hanging in the air. There is no indication in the record anywhere that blame was placed upon anyone concerning the claim involved, and the statement a few months later by Cox that he would run the plaintiff out of the insurance business was in connection with the same claim. On cross-examination the plaintiff admitted that on December 10, 1954, when a pretrial deposition was taken, he answered under oath certain questions then put to him

and that he had then said he thought that some fellow employees—some higher, some on the same basis with himself—were not friendly or tolerant, but that there was no personal antagonism toward him on the part of such employees. This statement was an admission and as such might be considered by the court as substantive evidence and legally sufficient to prove the facts admitted. Wigmore on Evidence, 3rd Ed., sec. 1048; McCormick on Evidence, sec. 239; Cleary, Handbook of Illinois Evidence, sec. 13.10; Brown v. Calumet River Ry. Co., 125 Ill. 600; Lambros v. Coolahan, 45 A.2d 96 (Md.); Litman v. Peper, 7 N.W.2d 334 (Minn.). This statement could properly be considered by the trial court in connection with the statements made by Cox to the plaintiff as indicating that in spite of such statements the plaintiff believed that Cox had no ill will toward him. To reach such a conclusion would not require weighing the evidence, which of course is not permitted in deciding a motion for a directed verdict.

██ The plaintiff argues that the court should not have directed a verdict since in any case the alleged libelous statement should have been submitted to the jury in order that the jury might determine whether or not malice existed, and in support of his contention cites Wharton v. Wright, supra. The rule with reference to this question is laid down in Newell on Slander and Libel, 4th Ed., section 345:

"That is to say, it is exclusively for the judge to determine whether the occasion on which the alleged defamatory statement was made was such as to render the communication a privileged one. The jury, however, will be the proper tribunal to determine the question of express malice where evidence of ill will is forthcoming; but if, taken in connection with admitted facts, the words complained of are such as must have been used honestly and in good faith by the de-

fendant, the judge may withdraw the case from the jury and direct a verdict for the defendant."

In 18 Amer. & Eng. Ency. of Law, 2nd Ed., p. 1050, it is stated:

"But where there is evidence of malice to rebut the occasion of privilege the judge must submit the case to the jury. In order to entitle the plaintiff to have the question of malice left to the jury, he need not show circumstances necessarily leading to the conclusion that malice existed, or such as are consistent with its non-existence, but they must be such as raise a probability of malice, and be more consistent with its existence than with its non-existence."

In National Disabled Soldiers' League v. Haan, 4 F.2d 436, the court said:

"Express malice may be found from the language itself, as well as from extrinsic evidence, and that question is one for the jury to determine. . . .

"If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant."

See also Dickins v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, 171 F.2d 21. The same rule is laid down in 53 C. J. S. Libel and Slander, sec. 228(b), and Chaloupka v. Lacina, 301 Ill. App. 173. In Robinson v. Home Fire & Marine Ins. Co., 59 N.W.2d 776 (Iowa), the court said (p. 783):

"Under some circumstances it has been held the defamatory language was sufficient to carry to the jury

the issue of actual malice, as where it is out of all proportion to the occasion. 'But to be sufficient for such purpose it must of itself have a reasonable tendency to prove that the false accusation proceeds from the ill will or ulterior motive which is the essence of malice, not merely that the person making it is angry because he believes it to be true.' Montgomery Ward & Co. v. Watson, supra, 4 Cir., 55 F.2d 184, 188 . . . .

"The use of strong or offensive language, in bad taste or want of sound judgment, if the speaker thinks the language is justified, is not evidence of malice. . . . [Citing cases.]"

Wharton v. Wright, supra, is in accord with the previously cited cases and does not support the plaintiff's contention. In that case the court said:

"In fact, the plaintiff is not confined to extrinsic evidence, but may rely on the words of the libel itself, and the circumstances attending its publication. If the expressions employed appear uncalled for and in excess of the occasion, there is enough evidence to go to the jury. Odger on Slander and Libel, 270, 271, 276, 280."

 The sole question in the case before us is whether the plaintiff had produced any evidence to show malice in fact on the part of Cox toward him which would require the trial court to submit the case to the jury. Considering all the testimony in the case there is nothing in the words used which of themselves and without extrinsic evidence would permit the drawing of an inference of malice therefrom. The extrinsic evidence concerning Cox's statements, taken in connection with the plaintiff's admission, falls far short of proof of malice in fact.

 The plaintiff also contends that the testimony with reference to the conduct of the plaintiff concerning his transactions with reference to sales of wrecked automobiles for salvage should not have been

admitted and that the court should have taken no notice of it because it might be considered as an attempt to prove the truth of the statement made by Cox and there was no plea of justification interposed. The plaintiff has misapprehended the purpose of the admission and consideration of such evidence. It is of course true that in all cases where an action is brought in slander or libel, proof of the truth of the statement is an absolute bar and that such evidence as to truth can only be properly introduced where there has been a plea of justification. However, in cases such as this, where the interposition of the qualified privilege shifts the burden of proving malice in fact to the plaintiff, such evidence of the truth of the alleged libelous statement is competent, not for the purpose of interposing an absolute bar, but for the purpose of showing that under all the circumstances involved therein the statement made by the person who is alleged to have libeled or slandered the plaintiff was based on facts which would counteract any implication of malice on his part. In the instant case the trial court could, while considering the evidence in the light most favorable to the plaintiff, properly draw such an inference. This evidence was properly before the court and could properly have been considered by it.

There is in the record before us insufficient evidence either extrinsic or intrinsic, to require the submission of the issues to the jury. There was no error in the court's ruling and the judgment of the Circuit Court of Cook county is affirmed.

Judgment affirmed.

SCHWARTZ, P. J. and ROBSON, J., concur.