GALE H. MYERS, Plaintiff-Appellee, *v.* HARRY F. SPOHNHOLTZ *et al.,* Defendants-Appellants.

(No. 56353;

First District (1st Division)—April 9, 1973.

Richard F. Watt and Russell Woody, both of Chicago, (Cotton, Watt, Jones, King & Bowlus, of counsel,) for appellants.

Elmer Gertz and Wayne B. Giampietro, both of Chicago, for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Harry F. Spohnholtz and George K. Gundersen (defendants) appeal from a judgment of $25,000 entered against them and in favor of Gale H. Myers (plaintiff) in a libel action tried before a jury. Before stating the respective contentions advanced by the parties, we will clarify one preliminary matter.

Plaintiff's complaint, as originally filed and as amended, described the defendants individually and as president and vice-president "* * * of and on behalf of all members of Chicago Local No. 4-L Lithographers

and Photoengravers International Union, an unincorporated association * * *." The answer of defendants to the second amended complaint described defendants in the same style. The verdict of the jury found the issues "in favor of the plaintiff and against both of the defendants." The judgment order referred to the defendants as such without further description. Defendants' post-trial motion referred to them without further designation. In the interest of propriety, we will consider that the judgment is entered solely against the defendants, as such, without further description or designation. This will be more appropriate and will conform to the law of this jurisdiction that an unincorporated voluntary association may not be sued in its associated name. (*Boozer v. U.A.W. of America*, 4 Ill.App.3d 611, 615, 279 N.E.2d 428.) The labor union mentioned in the complaint could not be sued in its own name for a money judgment as in the case at bar. (*Murley v. Local Union No. 147 of Bro. of Painters*, 133 Ill.App.2d 578, 273 N.E.2d 538.) All proceedings herein are, therefore, amended by striking out the name of the labor union, with the cause to proceed against the two defendants individually. Supreme Court Rule 366(a), 50 Ill.2d Rule 366(a).

On January 7, 1965, David Carr, President of Local 78-L in Miami, wrote to defendant Spohnholtz, then President of Local 4-L in Chicago. The letter advised that plaintiff had come into the area, wanted to join Local 78-L and had submitted an application. The application showed that he was expelled from Chicago Local 4-L in 1938. The letter requested any information that could be given concerning plaintiff, especially regarding his eligibility for membership in Local 78-L.

On January 21, 1965, defendant Spohnholtz responded by a letter to David Carr as follows:

"Mr. David Carr
President, Local No. 78-L
Lithographers & Photoengravers
 International Union
700 S. W. Second Avenue
Hallandale, Florida

Re: Gale Meyers [sic]
Dear Brother Carr:

We have probably a greater record on Gale Meyers [sic] than appears formally on the records of the Local. To condense it, I am enclosing a copy of a letter sent to Don Biedenbach by George Gundersen of this Local in 1960 which spells out most of the record.

Meyers [sic] has popped up in a number of shops around town

here—usually in a capacity where we could easily avoid taking him back into membership in the Union—and we have not taken him back since he was expelled originally in 1939.

I would certainly recommend that, since his ability to stay in one spot for any length of time is questionable, it may be best for your Local not to get involved with membership; however, use your own judgment.

Fraternally,

/s/ Harry F. Spohnholtz,

Harry F. Spohnholtz,<br>
President, Chicago<br>
Local No. 4-L, L.P.I.U."

As stated in this letter, there was contained therein a copy of a previous letter dated April 7, 1960, written by defendant Gundersen, addressed to the President of Local 11 in Rochester, New York, as follows:

"Mr. Donald Biedenbach, President
A. L. of A. Local No. 11
511 N. Goodman St.
Rochester, New York

Dear Sir and Brother:

Gale Meyers [sic] was first initiated on April 7, 1936. He violated Local No. 4 By-Laws on employment by soliciting a job at one of our contract shops. He was requested to appear before our Council Board. His attitude at this Council Board Hearing was most antagonistic. He admitted that he thought himself out of place as a member of Local No. 4 and so much as recommended his own expulsion. As a result, he was expelled on March 10, 1939 for 'Contempt of Association'. His indebtedness at the time of this expulsion amounted to $55.50.

Gale Meyers [sic] then went into business for himself. The Company was known [sic] as the Offset Fine Arts Company. In December of 1950 the company went bankrupt. Their assets were far less than their liabilities. Therefore, we were unable to collect wages, vacation pay or Health and Welfare premiums due, because he had obligations separate from wage claims totaling approximately $12,000.00. These obligations were withholding and social security taxes to the government, mortgages on equipment, etc.

In 1956 Gale Meyers [sic] wanted to return to work at the

trade. The Local Council Board denied membership. He requested reconsideration on his case and wanted to reinstate himself. The Council Board again took up the matter and their decision was to reconsider the case again at such time as he is employed at the trade. No commitment was made, however, as to whether such consideration would be favorable or unfavorable.

This just about completes our records on Gale Meyers [sic]. From the above history you may draw your own conclusions.

> Fraternally yours,
> George K. Gundersen,
> Vice President, Local No. 4."

In this court, defendants contend that the trial court erred in failing to hold as a matter of law that the communications forming the basis of plaintiff's claim are conditionally privileged and erred in failing to instruct the jury accordingly; in failing to hold that the Statute of Limitations barred recovery for the publication of one of the letters in question; in permitting the jury to consider republication in the absence of evidence that defendants authorized or ratified it; in denying defendants' motions for directed verdict and their post-trial motion; in excluding relevant and material evidence offered by defendants and in giving and refusing certain instructions. Plaintiff responded by urging that the letters in question were not protected by qualified privilege; no part of the action was barred by the Statute of Limitations; the court properly refused to instruct the jury that defendants were liable only for the original publication of the letters; defendants were not entitled to a verdict in their favor and the trial court committed no prejudicial or reversible error.

Plaintiff takes the position that the letters sent by defendants in April of 1960 and January of 1965 are both libelous *per se*. The trial court so ruled by an order granting plaintiff's motion to strike a portion of defendants' answer and also by an instruction to the jury (Plaintiff's instruction No. 11). Since defendants do not take issue with this contention, it need not be considered. However, defendants urge strongly that under the circumstances here disclosed, these letters were both conditionally privileged. The verdict of the jury described its award as "compensatory damages." The jurors drew a line upon their verdict striking out the words "punitive damages in the sum of" which appear therein. This line continues across the blank space provided for insertion of an amount immediately after the stricken language.

On plaintiff's motion, and over defendants' objection, the trial court submitted to the jury the issue of whether these letters sent by defen-

dants were conditionally or qualifiedly privileged. The court instructed the jury as follows (Plaintiff's Instruction No. 15):

"In order for a person who has made a defamatory statement to be entitled to a qualified privilege, he must prove that the statement was made in good faith on a proper occasion and in a proper manner to proper parties and limited in its scope to a proper purpose."

Again, in the instruction on the issues (Plaintiff's Instruction No. 22, based upon IPI-20.01.01), the court instructed the jury that the defendants claimed as an affirmative defense that "* * * [t]he statements contained in the letters are privileged as a proper communication in response to an inquiry concerning plaintiff and that they had reasonable cause for believing the matters contained therein were true."

In addition, in defining to the jury the burden of proof on the issues (Plaintiff's Instruction No. 23, based upon IPI-21.02.02, 21.03), over objection by defendants, the court again described the so-called affirmative defense of privilege. The jury was also instructed that if they found the letters were privileged as thus defined, that plaintiff had the burden of proving that the privilege had been abused.

In a number of cases, the reviewing courts of Illinois have held that the issue of whether an allegedly libelous letter "* * * was a qualifiedly or conditionally privileged communication, or not, was a question of law for the court only, not a question of fact for the jury." This appears amply from a long line of accepted decisions in Illinois. *Schlaf v. State Farm Mutual Auto Insurance Co.*, 15 Ill.App.2d 194, 203, 145 N.E.2d 791; *Judge v. Rockford Memorial Hospital*, 17 Ill.App.2d 365, 384, 150 N.E.2d 202; *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 243 N.E.2d 217.

■■ Therefore, the trial court was in error in tendering to the jury for their determination the issue as to whether or not the letters in question were conditionally privileged. The resolution of this issue was a question of law which should have been decided solely by the trial court. The essential elements which bear upon the existence of conditional privilege appear to be: (1) good faith by the writer; (2) an interest or duty to be upheld; (3) a statement limited in its scope to that purpose; (4) a proper occasion and (5) publication in a proper manner and to proper parties only. See *Zeinfeld* citing from *Judge* at 41 Ill.2d page 349.

■■ It is our considered opinion that the trial court should have found, as a matter of law, that all of these essentials are satisfied in the case at bar and that both of the letters in question were conditionally privileged. As regards both communications, it appears that the respective writers thereof each had an interest or duty to be upheld. Both of them

acted in their capacity as officials of the local union who were discharging their duty to officers of affiliated local unions in other cities. The contents of both letters were limited in scope to the purpose of responding adequately to the inquiries. In addition, the duty of responding to these inquiries by defendants demonstrates that both letters were sent upon proper occasions.

Furthermore, both of these letters were sent by the respective defendants to the proper party only; namely, the officials of the respective local unions who made the inquiries. Plaintiff urges that he was damaged and injured by the fact that the contents of these letters came to the attention of Paul Luther who was one of the proprietors of the Color-Ex Company. Plaintiff testified that he had attempted to purchase a proprietary interest in this firm, which was established in Miami, and that he could consummate this arrangement only if he were able to render production services in the shop of the company. It is undisputed that labor contract provisions required plaintiff to become a member of Local 78-L of the Lithographers and Photoengravers International Union in Miami for this purpose.

It appears from all of the evidence that David Carr, president of this local union, to whom the letter of January 21, 1965 was directed, had never spoken to Paul Luther except upon one occasion entirely unrelated to the case at bar. Carr testified that he did not show either of the letters to any person except possibly officials of his local union, No. 78-L. The evidence does not show how or from what source Paul Luther obtained copies of the two letters. It shows only that Luther read these letters to plaintiff on the telephone. Plaintiff drafted a proposed letter to be retyped by Luther on his own letterhead and then sent to plaintiff. This letter described the letters as submitted to Luther "by the Local President." Luther retyped plaintiff's letter and sent it to plaintiff together with copies of the allegedly libelous letters. Luther modified the above quoted language suggested by plaintiff and the letter actually written by him stated that the letters had been "submitted to us through our union local secretary." However, Luther's Color-Ex firm had no collective bargaining agreement or other official relationship or dealings with Local 78-L with which David Carr was connected, but only with Local 78-P. These two Miami locals using the same number and different letters were separate and independent at the time of the writing of the letter of January 21, 1965 and merged in 1966. There is no evidence that defendants had any part in disclosing these letters to Paul Luther of the Color-Ex firm.

Donald Biedenbach, recipient of the earlier letter, testified that he never presented it to, or read or referred to it at any union meeting. He

did not send a copy of the letter to any person connected with the firm with which plaintiff was then associated and never discussed it with any such person. Upon receipt of the letter, he read it, then put it into his file and did nothing further with it.

■■ The record also shows that plaintiff never tendered his initiation fee to Local 78-L so that his application for membership was actually never denied by this union. We, therefore, approve the position urged by defendants that there is no evidence of republication by them of either of the letters. The respective activities of defendants terminated with the sending of both letters. This leads to the conclusion that the trial court should have ruled as a matter of law that publication of these letters by defendants was in a proper manner and to proper parties only.

■■■ Similarly, it appears to us that the element of good faith by the writers of both letters is patently present so as to complete all of the elements required for the existence of conditional privilege. Good faith in this concept should not be confounded with issues pertaining to actual or express malice or abuse of the conditional privilege. Whether the letters in question were sent in good faith in order to render them conditionally privileged was an issue of law to be decided solely by the court. The court should have determined this primarily from the face of the letters themselves, from the occasions on which they were written, from the conduct of defendants in connection with these letters and also from the relationship between the writers of the letters and the addressees. All of these sources, when analyzed, are indicative solely of good faith by defendants in the making of their responses to the inquiries.

■■■ This question of law must be carefully distinguished from factual questions regarding actual or express malice which may lead to an abuse of a conditional privilege. "Such abuse occurs if the publisher does not believe in the truth of the defamatory matter, or has no reasonable grounds for believing it to be true. *Suchomel v. Suburban Life Newspapers, Inc.*, 40 Ill.2d 32; Restatement of the Law, Torts, secs. 600-601, pp. 264, 265." (*Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 350, 243 N.E.2d 217.) Once it appeared that these communications were conditionally privileged, the burden rested upon plaintiff to prove actual or express malice on the part of defendants as above defined which would constitute an abuse of the privilege so as to avoid it. Plaintiff was obliged to prove such malice by a preponderance of the evidence, precisely as any other factual issue. (*Flannery v. Allyn*, 47 Ill.App.2d 308, 318, 198 N.E.2d 563.) Quite erroneously, the instructions to the jury referred to the existence of malice as an "affirmative defense" of defendants. Plaintiff's Instruction No. 22.

570

 It follows, therefore, that the court should have ruled that these communications were conditionally privileged as a matter of law. Thus, the issues in this case were submitted to the jury under an entirely erroneous theory. These rulings of the trial court deprived defendants of a fair trial and constituted reversible error.

██ It remains, however, to determine the merits of defendants' contention that their motions for directed verdict at the close of all the evidence and their post-trial motions for judgment in their favor should have been granted by the court. In this regard, we will apply the established rule that the verdict should have been directed in favor of defendants or judgment *n.o.v.* entered only if it appears, after a review of the entire record on the issue of the existence of actual or express malice, that all of the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors the defendants that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill.2d 494, 510, 229 N.E.2d 504.

 It should be pointed out initially that the second count of plaintiff's second amended complaint alleged that defendants had conspired to injure plaintiff's good name and reputation by circulation and publication of defamatory libels against him. At the close of plaintiff's case, on motion of defendants, the court directed a verdict in favor of defendants on this second count and ordered judgment in their favor thereon. No cross-appeal was taken by plaintiff from this order. (See *De Phillips v. Mortgage Associates, Inc.,* 8 Ill.App.3d 759, 762, 291 N.E.2d 329.) Our analysis of the evidence leads to the conclusion that this ruling of the court was entirely proper. Consequently, we will consider the evidence of malice, as above defined in *Suchomel* and *Zeinfeld,* regarding whether defendants believed in the truth of the allegedly defamatory matter or had reasonable grounds for believing it to be true as to each defendant individually and in accordance with the *Pedrick* standard. This necessarily entails examination of the testimony and of the matters contained in the files of Local Union No. 4.

Defendant Gundersen is presently a vice-president of Local 245 in Chicago. He was a member of the executive board of this union commencing with 1950. In 1953, he became financial secretary-treasurer and in 1956 vice-president. Shortly before he wrote the letter dated April 7, 1960, defendant Spohnholtz told him to review plaintiff's record and to send it on to Donald Biedenbach, the President of Local No. 11 in Rochester, New York. Gundersen did not recall speaking to Biedenbach but he received the information regarding this inquiry only from Spohnholtz.

The Chicago local union here involved has approximately 4500 to 5000

members. Its records included some 12,000 various files pertaining to individual members and 400 to 450 files concerning various companies. Gundersen testified that he reviewed the personal file pertaining to plaintiff and also the file pertaining to Offset Fine Arts, Inc. with which plaintiff was at one time connected. In addition, he requested the office manager of the local union to go through the minutes and to give him any which contained information regarding the status of plaintiff's membership.

These records showed, which was true, that plaintiff was expelled from the local union on March 10, 1939 for "contempt of association." The minutes recite that plaintiff "* * * felt at that time he did not need union support and could get along independently." Also these minutes reflect that plaintiff owed the local union dues and assessments in the amount of $55.50. This was the figure set forth in the first paragraph of the letter written by Gundersen on April 7, 1960.

■■ Gundersen testified that when he prepared the second paragraph of the letter regarding the bankruptcy of Offset Fine Arts, Inc., he depended upon notations on the record cards of employees of that firm at the time it closed as well as on the minutes of union meetings. The trial court refused to receive these cards in evidence. In our opinion, however, these cards were records of the local union kept in the usual and ordinary course of its business and, therefore, should have been received in evidence. (Supreme Court Rule 236(a), 50 Ill.2d Rule 236(a).) It was reasonable for defendant Gundersen to depend upon the notations on these cards which showed that in December of 1950 Offset Fine Arts, Inc. went into bankruptcy as stated in the second paragraph of his letter. He testified that he assumed this fact from looking at the cards. He further testified that the Offset file showed that the local union was unable to collect wages, vacation pay and health and welfare premiums from Offset.

According to plaintiff's own testimony, he had founded Offset Fine Arts, Inc. in 1939, operated the company at a profit and sold his interest out in 1948. Thus, he maintains that, when the company did go out of business in 1950, he had no connection whatsover therewith. There is nothing in this record to show that Gundersen knew this fact and there is nothing in the union files to advise him directly that plaintiff had liquidated his holdings in the corporation prior to the time it closed its doors. Included in the file was a copy of a complaint at law, comprising some eight pages, filed by the attorneys for Local 4 of Chicago in behalf of nine members. Count I sought to recover unpaid wages, vacation pay and termination wages from Offset Fine Arts, Inc. Count II sought the same recovery against Randall F. Knight, Rupert A. Young and Isabell

Knight who were described as the three directors of the corporation and its president and secretary-treasurer. This document does not contain plaintiff's name. However, a most careful reading of the complaint shows that it contains no allegations regarding ownership of the corporate stock by any of the three defendants joined thereto so that it is not inconsistent with the hypothesis of the existence of a continued financial or stock interest in the corporation by plaintiff. In fact, Gundersen testified specifically that there was nothing in the file stating that plaintiff was no longer connected with Offset when it terminated its business. He stated, "Otherwise I would have written the letter differently."

On September 27, 1949, a letter was written by the union welfare fund to "Mr. Randall Knight, Offset Fine Arts, Inc." advising him of monies due the Welfare Fund. This letter also stated, "We are aware of the change in personnel at your plant * * *." There were also checks in the file which were received by the Union Health & Welfare Fund which were signed by a person other than plaintiff. In addition, on November 22, 1950, the president of the Chicago local wrote to "Mr. R. Young, Offset Fine Arts, Inc." advising again of a default in payments to the union welfare fund. The files also show copies of correspondence between counsel for the local union and other persons with reference to sums allegedly due from Offset "as of the time it closed its doors." There is a copy of one letter dated January 26, 1951, written by counsel for the local union which is apparently the source of the statements contained in the second paragraph of the April 7, 1960 letter regarding obligations due from Fine Arts. This letter states that the attorney did not at that time approve of the filing of bankruptcy proceedings against Offset.

There are other copies of letters dated April 17, 1951, June 8, 1951, October 24, 1951 and also March 28, 1952. These letters show reports made by the attorney to certain members regarding the fact that a judgment was being sought "not only against the corporation but against the individuals who ran and owned the corporation." The letter goes on to state that the court refused to allow the case to proceed against the individual owners, but only against the corporation.

Plaintiff urges that this evidence is sufficient to show the presence of malice in connection with the writing of Gundersen's letter. We cannot accept this argument. It may be that if a trained and experienced lawyer, such as counsel in the case at bar, examined each and every document in the file in minute detail, and carefully compared the letters from the attorney to the complaint against Offset and others, such person might conceivably be put upon notice as to whether or not plaintiff had severed his financial connection with the corporation by April 7, 1960, when Gundersen wrote the letter. However, we cannot conclude that this evi-

dence is sufficient to show that Gundersen did not actually believe that the statements in his letter were true or that there were no reasonable grounds for his clearly expressed belief that his letter did speak the truth. It should also be noted that these copies of letters and other matters antedated the Gundersen letter by approximately eight years.

Plaintiff also urges that there was no information in the union files to support the statement in the first paragraph of the Gundersen letter that plaintiff violated the union bylaws by soliciting a job at a shop under contract with the local. However, it appears from minutes of a special meeting of the local council, dated February 24, 1939, that the shop chairman of a company under contract with the union had notified the union president that plaintiff was soliciting a job in that shop without first obtaining the consent of the local union. The minutes show that the president notified plaintiff by telegram to appear and that he had failed to respond. This was the basis of plaintiff's expulsion for "contempt of association." Plaintiff urges that investigation showed that he owed nothing to his former employees. The minutes of the local council show that certain members had been contacted and had advised that plaintiff did not owe them any money. This is an ambiguous statement which might well have had reference only to personal debts or obligations between plaintiff and other members of the local union.

■■ However, defendants tendered in evidence a certified copy of petition, schedules and statement of affairs filed on March 22, 1960 in bankruptcy proceedings in the United States District Court for the Northern District of Illinois, Eastern Division, involving plaintiff as the bankrupt. A number of the headings in these papers, apparently prepared in plaintiff's behalf, show plaintiff's name and beneath the name, Offset Fine Arts in parenthesis. In addition, the schedules signed under oath by plaintiff show that plaintiff was then the owner of 5000 shares of common stock in Offset Fine Arts, Inc., described therein as "defunct." Although these documents were ostensibly not available to either of defendants at the time they wrote their respective letters, they were competent as an admission by plaintiff as a party-opponent to the effect that when the schedules were executed by him he remained the owner of what appears to be a substantial stock interest in the corporation. (See Cleary, Handbook of Illinois Evidence, 2nd Edition, sec. 17.11 page 280.) These schedules were filed some 16 days prior to the Gundersen letter.

Gundersen testified that he met plaintiff for the first and only time in the union office during 1956. He testified that he had never spoken to plaintiff at any other time, that he did not know that plaintiff had sold his interest in the corporation and he did not know plaintiff's successors

therein. He testified further that he knew of Offset Fine Arts, Inc., operating in Chicago, as an excellent shop as regards production quality. Upon most careful consideration of all of the evidence, and viewing all of it in its aspect most favorable to plaintiff, we must conclude that Gundersen had reasonable grounds for believing the statements in his letter to be true; and, further, that he actually believed them to be true.

As regards defendant Spohnholtz, he became a member of the Chicago local in June of 1929. He became a member of the local executive council in 1943; financial secretary in 1947; vice president in 1950; and president, the position he now holds, in 1956. On January 7, 1965, the president of Local 78-L in Florida wrote to Spohnholtz and asked for information regarding plaintiff with the statement that plaintiff had applied for membership in the Florida local. In his application for membership, plaintiff had stated that he had been expelled from the Chicago local. This type of inquiry between locals was common procedure in accordance with the International constitution. Spohnholtz testified that he received some 25 to 30 such requests every year.

Upon receipt of this inquiry, Spohnholtz found in the local's file pertaining to plaintiff a copy of the letter written by Gundersen in 1960. This refreshed his recollection regarding his request that Gundersen write this letter. However, he testified that this was the first time he had ever seen a copy of this letter. He then wrote the short second letter dated January 21, 1965, in which he enclosed a copy of the previous letter. He did not then again check the facts set forth in Gundersen's letter. He testified that he and Gundersen had "worked together for a long period of years" and that he had "no reason to disbelieve" the previous letter. The complete dependence of Spohnholtz upon the Gundersen letter is evidenced by his misspelling of plaintiff's name precisely as in the previous letter. At one time, he had seen checks issued by Offst Fine Arts signed by Rupert A. Young applicable to union pension payments which had been returned because the bank account had been closed. He testified that he believed then that plaintiff was "a part of" Offset.

Spohnholtz testified that he met plaintiff in 1956 and knew that plaintiff had been a member of the local union. He did not recall seeing plaintiff since that time or having any other personal contact with the plaintiff to the present and doubted that he had even spoken to plaintiff on the telephone. In effect, he depended upon the conclusions previously reached by Gundersen. As regards Offset, he knew that it had closed down in 1950 but did not know that plaintiff had no connection with it at that time. Under these circumstances, we are impelled to the conclusion

that Spohnholtz actually believed his letter to be completely true and that he had reasonable grounds for this belief. This record graphically shows only the most fleeting personal contact between either of defendants and plaintiff. Certainly it displays no "* * * ill will towards the plaintiff, or an actual intention to injure or defame * * *" him. Note the definition of malice in these terms in the frequently cited authority of *Judge v. Rockford Memorial Hospital*, 17 Ill.App.2d 365, 387, 150 N.E.2d 202.

■■ It must be considered here that the legal standard for such express malice, which is sufficient to avoid conditional privilege, must necessarily exceed simple negligence. Under the accepted legal standard, the conduct of defendants in writing these letters is sufficient to limit their conditional privilege only if they had no reasonable grounds for believing their statements to be true or actually did not believe them to be true. We have made every effort to construe all of the evidence in its aspect most favorable to plaintiff. We conclude that the record so overwhelmingly favors defendants that the verdict against them cannot stand. It follows necessarily that the verdict against both defendants should be set aside and judgment entered in their favor.

In view of this conclusion, it is unnecessary for us to pass upon the remaining contentions raised by defendants. The judgment against defendants is accordingly reversed and the cause remanded with directions to enter judgment for the defendants and against plaintiff.

Judgment reversed and cause remanded with directions.

BURKE, P. J., and EGAN, J., concur.