UNA HARREL, Plaintiff-Appellee, v. DILLARDS DEPARTMENT STORES, INC., Defendant-Appellant.

Fifth District · No. 5—93—0572

Opinion filed November 30, 1994.—Rehearing denied January 25, 1995.

Dennis E. Rose, of Donovan, Rose, Nester & Szewczyk, P.C., of Belleville, for appellant.

James R. Mendillo, of Freeark, Harvey, Mendillo, Dennis & Wuller, P.C., of Belleville, for appellee.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

Defendant, Dillards Department Stores, Inc., appeals from a jury verdict in favor of plaintiff, Una Harrel. The jury awarded plaintiff $40,000 in compensatory damages and $40,000 in punitive damages on her claims of common law defamation and a new tort theory of compelled self-defamation. The factual basis of plaintiff's claim is that defendant's assistant store manager fired her after accusing her in front of her supervisor of attempting to steal merchandise from the store at which she was employed.

Defendant presents four issues for our review: (1) whether the trial court erred in finding as a matter of law that plaintiff had proved common law defamation against defendant; (2) whether the trial court erred as a matter of law in adopting the theory of compelled self-defamation; (3) whether the trial court erred as a matter of law in allowing the jury to consider the issue of punitive damages under the theory of compelled self-defamation; and (4) whether the trial court erred by giving the jury improper instructions and verdict forms. We reverse on issues (1) and (2).

The facts of the case, for the most part, were not disputed. However, because defendant asks us to reverse the jury verdict and the trial court's denial of its post-trial motion, we must view the facts in the light most favorable to plaintiff. After viewing all of the evidence in the light most favorable to plaintiff, we conclude that the facts so overwhelmingly favor defendant that the verdict cannot

stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Plaintiff was employed by defendant as a part-time retail salesperson in its Fairview Heights store from 1980 until her termination on September 26, 1988. Defendant had no employment contract with plaintiff that prevented defendant from discharging plaintiff at will. The events that led to the termination of plaintiff's employment occurred between August 29, 1988, and September 26, 1988.

Plaintiff was cross-examined about a prior incident that had occurred in March 1988, when plaintiff had placed seven items of women's apparel in a bag "in the hold behind where people also hide sometimes for a hold for people." She testified that a co-worker, Carol Neilson, found the bag containing the seven items.

Hillarie Hutson, plaintiff's immediate supervisor, testified that she found the seven items when she was cleaning out the stock room and that she took the items to the store's security office because the items did not have any name or receipt on them, they were in a suspicious place, not in the area designated for holds, and they were hidden behind other items so that she would not have seen them if she had not moved the other items during cleaning.

Hutson talked to plaintiff about this incident, but she did not accuse plaintiff of attempting to steal the garments because plaintiff explained that she had placed the garments in the stock room for a customer. Hutson warned plaintiff verbally that she had not followed the proper procedure for placing merchandise on hold and that what plaintiff had done "certainly looked suspicious in that that was not proper behavior." A store security officer wrote a report about this incident, which report was made a part of plaintiff's employee file.

On August 29, 1988, plaintiff and a co-worker, Pat Isaak, picked out six items of winter clothing for plaintiff. Plaintiff put the six items on hold for herself under a fictitious name. Plaintiff and Isaak both knew that store rules prohibited them from holding items for themselves this way, but employees customarily held items in this manner anyway. A couple of days later, Isaak called plaintiff at home to see if she still wanted to purchase the six items. Plaintiff told Isaak that she wanted to purchase four of the items but wanted the remaining two items to remain on hold. Isaak rang up plaintiff's purchase and charged them to plaintiff's credit account. Isaak placed the four items in a clear, plastic bag, stapled the receipt to the bag, tied the bag at the bottom, and placed the bag in the stock room. Isaak left the remaining two items, two Pendleton skirts, hanging at the wrap desk.

540

Plaintiff worked a total of eight days between August 31, 1988, and September 10, 1988. Plaintiff was on vacation from September 10, 1988, until September 21, 1988. During the eight days that plaintiff worked before her vacation and after her purchase, she forgot about her purchase and left it at the store. On September 13, plaintiff came to the store and removed the receipt from the bag in order to participate in a promotional event at the mall, "bonus bucks," in which mall customers enter contests with receipts of prior purchases. Plaintiff testified that she intended to take her purchase home with her that day but again forgot it.

On September 21, 1988, while plaintiff was still on vacation, Carol Neilson discovered a bag in the stock room containing six items of women's clothing, but with no receipt on it. This information was related to Hutson, who ordered the items placed back on the floor for sale. After the items were placed back on the floor, Isaak was told what happened. Isaak eventually realized that the items in the bag were the same items she had sold to plaintiff on August 31, 1988. Isaak told Hutson that four of the items had been sold to plaintiff. Isaak retrieved the four items from the sale floor and called plaintiff to let her know what had happened. Isaak had never seen more than four items in the bag and had no knowledge about how or whether two additional items entered the bag. Plaintiff testified that when Isaak called her on September 21, Isaak told plaintiff that there were six items in the bag. Plaintiff testified that she told Isaak to hold onto the bag so that she (the plaintiff) could come into the store with the police, who could fingerprint her and determine that she had never touched the bag (plaintiff apparently forgot about previously removing the receipt from the bag).

Plaintiff next worked on September 22, at which time she told Hutson that she had the receipt for the four items and that she did not know anything about the additional two items. According to plaintiff, Hutson told her that she did not think there were more than four items in the bag. Nothing further was said to plaintiff that day or during her shift on September 23, 1988. However, Hutson apparently notified security.

Plaintiff next worked on September 24, 1988. After lunch on that day, a security person talked to plaintiff, after which plaintiff went to her work area and told her co-worker that she was going off the floor to talk to John Arble, the store manager, "because [she] was being accused of wanting to steal." The details of plaintiff's conversation with Arble were not related because he was deceased at the time of the trial. After the meeting with Arble, plaintiff went back to work.

Later that day, plaintiff met with Arble and Thomas Kirby, the

assistant store manager. Plaintiff was told that there was a problem with her wanting to take two skirts that she had not purchased. Plaintiff testified that she denied attempting to steal anything. Plaintiff also told Arble and Kirby that she did not want to get Isaak in trouble. Plaintiff offered to resign and told Kirby that he could fire her for violating the rule regarding holding clothes, but that she did not intend to steal anything. After the conversation with Arble and Kirby, plaintiff was suspended and told not to come back to work until September 26, 1988. A written account of this meeting, signed by both Arble and Kirby, was introduced into evidence. The report corroborates Kirby's testimony about this meeting.

Thomas Kirby testified that a part of his duties as assistant store manager included hiring and firing store personnel. He made the decision to terminate plaintiff in conjunction with Arble. Kirby's reason for firing plaintiff was that he believed that plaintiff was attempting to take two items out of the store that she had not purchased. The same reason is listed on the documents plaintiff signed on the date of her discharge. Kirby testified that he would not have fired plaintiff if he had not believed she intended to steal the two items, because she was a very good employee. The exhibits introduced into evidence show that plaintiff received above-average ratings on all previous job-performance reviews.

The information Kirby obtained in his investigation of the September 1988 incident consisted of verbal reports from Hutson, Carol Neilson, and Cathy Lynch, a security officer. Both Lynch and Neilson told him that they counted six items in the bag of clothing that contained the four items plaintiff had purchased. Kirby also obtained two written reports from Cathy Lynch. Kirby discussed all of this information with Arble before he talked to plaintiff on September 24, 1988.

In Kirby's first meeting with plaintiff, she was very upset. Kirby and Arble watched plaintiff's reactions and demeanor. When plaintiff offered to resign, Kirby got the impression that plaintiff felt she had done something wrong. Plaintiff was suspended immediately after this meeting. Kirby again discussed the matter with Arble after plaintiff left. After the first interview with plaintiff, Kirby again talked to Hutson and Lynch. Kirby double-checked Lynch's report. Lynch assured Kirby she was certain about all of the details. He used Lynch's report as an additional basis for firing plaintiff.

Although Kirby did not ask Neilson for a written report, he did interview her. Further, Kirby asked Hutson and Lynch if they were aware of any ill will between plaintiff and Neilson. Plaintiff testified that Neilson, who originally found the bag and claimed that six items

were in it, may have had a grudge against plaintiff because plaintiff had received an award for selling merchandise and Neilson had not, even though plaintiff worked part-time and Neilson worked full-time. Kirby testified that Hutson and Lynch both told him that they were not aware of any problems between plaintiff and Neilson.

Plaintiff testified that when she came in to work on September 26, 1988, she met with Kirby and Hutson. Kirby told plaintiff in this second meeting, in the presence of Hutson, plaintiff's immediate supervisor, that plaintiff was being terminated because Kirby believed that plaintiff intended to steal the two skirts. This statement by Kirby in the presence of Hutson is the defamatory statement upon which plaintiff bases her suit.

The evidence, when viewed in the light most favorable to plaintiff, can be summarized as follows. Kirby was responsible for hiring and firing store personnel. He was aware of two incidents involving plaintiff in which her behavior did not comport with company rules for holding merchandise. Kirby concluded that plaintiff intended to steal two items from the store, based upon interviews with and reports from a security officer, a co-worker of plaintiff, plaintiff's supervisor, the store manager, and the plaintiff. Kirby had no personal knowledge that plaintiff intended to steal anything but relied entirely upon reports from others and his interview of plaintiff. Based upon the information he gathered, Kirby concluded, along with Arble, that plaintiff should be terminated for dishonesty, and he communicated his decision to plaintiff in the presence of her immediate supervisor. Plaintiff denies attempting to steal anything, and for the sake of this order, we assume that to be true.

Both parties agree that defendant was entitled to a qualified privilege, which is a communication that might be defamatory and actionable except for the occasion on which or the circumstances under which it was made (*Kuwik v. Starmark Star Marketing & Administration, Inc.* (1993), 156 Ill. 2d 16, 619 N.E.2d 129), for Kirby's statement as to why plaintiff was fired. Both parties agree that plaintiff was required to prove that defendant acted with actual malice in making the statement that plaintiff was being terminated for dishonesty, although there may be a question whether the concept of "actual malice" should be used after *Kuwik*.

Since it is not disputed that Kirby had a qualified privilege in stating in the presence of Hutson that plaintiff was being discharged for attempted theft, we need not discuss that aspect of *Kuwik* and the changes it made in prior law in any great detail. (See *Myers v. Spohnholtz* (1973), 11 Ill. App. 3d 560, 297 N.E.2d 183.) Suffice it to say that it is undisputed by the plaintiff that the evidence presented

below established that defendant had a sufficiently important interest in telling plaintiff's immediate supervisor of the reason for plaintiff's discharge, and that the supervisor's knowledge of the allegations against plaintiff would surely be of service to defendant in the lawful protection of its interest in preventing theft and dishonesty by its employees in the future.

We recognize that defendant's argument that there was no publication of a defamatory statement raises an interesting question, namely, is a statement by the person in authority to another person involved in the investigation a publication? Unquestionably, a statement accusing plaintiff of attempted theft by the assistant manager to a person not involved in the investigation of the alleged theft would be a publication of such. In this case, however, the statement by Kirby was made to plaintiff in the presence of her supervisor, Hutson, the person who initiated the investigation. Is the law such that a member of an investigatory team cannot give his or her opinion to another member of the team as to the guilt of a suspect without creating an actionable cause for defamation? Since the parties agree that the statement made by Kirby was conditionally privileged, we will leave the question open for a future decision of whether defamatory statements or opinions made among an investigatory group should be considered a publication.

We now turn to the pivotal issue presented by this case: whether the evidence was sufficient to support the jury's verdict implicitly finding that defendant via Kirby made the allegedly defamatory statement to Hutson with a direct intention to injure or with a reckless disregard of plaintiff's rights and of the consequences that might result to her. (*Kuwik*, 156 Ill. 2d at 30, 619 N.E.2d at 135.) "[A]n abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." (*Kuwik*, 156 Ill. 2d at 30, 619 N.E.2d at 136.) "Reckless disregard" means "proceeding to publish the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 237-38, 552 N.E.2d 973, 981.

It should be noted that, on the question of what is necessary to prove an abuse of the qualified privilege, *Kuwik* increased the burden of proof previously described in *Mittelman* by requiring that the plaintiff show either a direct intention to injure another, as opposed to merely proving defendant knew the matter was false, or a reckless disregard of the defamee's rights and of the consequences that may

result to her, as opposed to merely proving that defendant had a high degree of knowledge that the matter was false. (See *Kuwik*, 156 Ill. 2d at 30, 619 N.E.2d at 135.) A careful reading of *Kuwik* indicates that "actual malice" still applies, since the supreme court stated that it was expanding the definition of abuse of a qualified privilege from the minimum standard of recklessness established in *Mittelman*. Thus, in order to prove that there has been an abuse of a qualified privilege, some degree of evil intent, ill will, or spite by the defamer toward the defamee must be shown. See *Dixon Distributing Co. v. Hanover Insurance Co.* (1993), 244 Ill. App. 3d 837, 612 N.E.2d 846, *aff'd* (1994), 161 Ill. 2d 433 (for a discussion of what "actual malice" means).

Plaintiff does not assert that defendant intended to injure her or that Kirby did not limit the scope of the communication or that he communicated the allegedly defamatory statement to an improper party. In fact, defendant's policy was not to communicate the reason for an employee's discharge with anyone. Plaintiff's sole argument is that there was ample evidence from which the jury could determine that defendant acted in reckless disregard of her rights and the consequences that would result to her when Kirby told her in the presence of her supervisor why she was being fired.

Plaintiff maintains that the defendant "failed [to] investigate thoroughly and verify the facts," that the evidence against the plaintiff was "woefully inadequate," and that the defendant was unable to establish any basis for its conclusion that the plaintiff was attempting to steal from the store. She argues that the investigation conducted by Kirby was so deficient that the conclusion reached by Kirby that the plaintiff would attempt a theft in such a manner was "ludicrous."

Plaintiff's only challenge to the investigation, as opposed to the conclusion reached, was that the investigation failed to establish that there were items in the bag that did not belong there and that even if there were items in the bag not belonging there, there was no evidence that plaintiff put them there or had knowledge that they were there. Plaintiff also stated that Kirby's credibility should be questioned because he failed to take a written statement from Carol Neilson, while he took one from Pat Isaak.

The issue is whether the investigation by the defendant was so deficient that it was apparent that Kirby had a high degree of awareness that his conclusion that plaintiff was attempting to steal the items was false, or that he entertained such serious doubts as to the truth of concluding that plaintiff was attempting to steal the merchandise that he recklessly disregarded plaintiff's rights and the

consequences that might result to her. *Kuwik*, 156 Ill. 2d 16, 619 N.E.2d 129.

When plaintiff argues that Kirby's and Arble's belief that plaintiff was guilty of an attempted theft was "ludicrous," she apparently wants this court to judge the conclusion reached by Kirby and Arble by the standards as to the burden of proofs used in courts of law. The standard in this case, however, is not whether there was proof beyond a reasonable doubt, by the preponderance of evidence, or by the greater weight of the evidence that plaintiff attempted to steal the items. No cases were cited to us that require employers to have such proof before they may state that they believe that the employee attempted a theft. Rather, the standard is that the plaintiff must prove that there was a direct intention to injure or a reckless disregard of plaintiff's rights by the defendant.

Our criminal courts determine on a daily basis whether probable cause exists for an issuance of a warrant of arrest, a search warrant, and an order in a preliminary hearing binding defendant over for trial. Persons are incarcerated, their houses searched, and their reputations ruined based upon a probable cause determination. The police stop, detain, and search individuals based upon a "reasonable suspicion." These decisions, which have a devastating effect on the defendant's freedom and reputation, are many times based upon hearsay testimony and a minimal amount of evidence. It is difficult to justify holding an employer to a higher standard than is required of the State in our courts.

Plaintiff does not suggest where or how there was a deficiency in the manner of the investigation. Plaintiff does not contend that there were other witnesses that should have been interviewed or that somehow defendant had the ability to obtain or should have obtained any physical evidence. All of the conclusions had to be drawn from the facts contained in the statements of the witnesses, in their believability, and in the inferences that could be drawn therefrom. The triers of fact, if we *arguendo* were to equate this investigation with a criminal prosecution, were Kirby and Arble.

Criminal defendants are found guilty or innocent on a daily basis by our courts based solely upon the believability of the witnesses as determined by the trier of fact, be it a judge or a jury, and we do not substitute our judgment of the believability of the witnesses for the judgment of the trier of fact. (*People v. Colclasure* (1990), 200 Ill. App. 3d 1038, 558 N.E.2d 705.) People are subjected to criminal prosecution on a daily basis based solely upon the State's Attorney's or police officer's belief that an alleged witness is telling the truth and that the suspect is lying. By what right can we hold Kirby and Arble

to a higher standard than we do a jury, a judge, a State's Attorney, or a police officer?

Plaintiff hints that there should have been eyewitness evidence for the discharge to be justified. The lack of eyewitness information cannot serve as the basis for an improper investigation, as circumstantial evidence is often the most compelling and reliable evidence available. *McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 515 N.E.2d 157; *Sandburg-Schiller v. Rosello* (1983), 119 Ill. App. 3d 318, 456 N.E.2d 192.

Plaintiff does not deny that the circumstances were suspicious and that her act of using a fictitious name to hold items was a violation of company rules, that a similar circumstance for which she was given a warning had occurred before, and that her offer to resign could have been misconstrued as an admission of guilt. Plaintiff testified that Kirby liked her, that she "loved" Arble, and that Kirby and Arble had no reason to harm her. Plaintiff even admitted the key issue in the case, and that is, she did not believe that Kirby would knowingly fire her unless he believed she had done something wrong.

There was absolutely no evidence presented showing malice, spite, or ill will on defendant's part. Moreover, Kirby and Arble did not rush to judgment and accuse the plaintiff of attempted theft upon receiving word from security. Plaintiff cites *Babb v. Minder* (7th Cir. 1986), 806 F.2d 749, as authority for holding a company liable for an inadequate investigation. *Babb*, however, supports the defendant's position in the case at bar, because in *Babb* the court found, in effect, that there was no investigation at all and that the defendants made defamatory statements based on unconfirmed rumors. The investigation in this case lasted five days and was quite thorough, considering nonprofessionals were conducting it. See also *Myers v. Spohnholtz* (1973), 11 Ill. App. 3d 560, 297 N.E.2d 183 (wherein the court reviewed an investigation less thorough than that conducted by Kirby and found the investigation sufficient to preclude a finding of actual malice or a high degree of awareness of probable falsity).

■ We and the jury, years later, cannot substitute our judgment for Arble's and Kirby's judgments, without having observed the witnesses and the plaintiff while they were being questioned in September 1988. Without there being some evidence that Kirby was acting with a direct intention to injure the plaintiff or so recklessly because he knew there was a high degree of probable falsity or entertained serious doubts as to the truth of his statement to plaintiff in the presence of Hutson that he thought plaintiff was attempting to steal the garments, we cannot allow the jury verdict to stand.

Finally, there can be little question that a finding of liability in this case would be a notice to all employers not to tell employees why they are being fired. Nor would a cautious employer even conduct an investigation for fear that someone might make a defamatory statement. The cautious employer would either fire an at-will employee immediately upon receiving notice of some problem or else keep the employee in spite of reservations as to the honesty of such employee and the example it would set for other employees. Causing unnecessary fear of litigation is a needless burden on our society.

The next issue we must address is whether the trial court erred in sending the case to the jury on the theory of compelled self-defamation, in addition to defamation. In reviewing the instructions to the jury on this theory and the evidence in support of this theory, the jury, most likely, was greatly influenced by this theory in reaching the verdict it did. Defendant argues that, at the time of the trial, the only Illinois court to consider the theory of compelled self-defamation held that it is not a valid cause of action, and as a result, the trial court erred in not following clear appellate court precedent. We agree.

In *Layne v. Builders Plumbing Supply Co.* (1991), 210 Ill. App. 3d 966, 569 N.E.2d 1104, the Second District Appellate Court held that the theory of compelled self-defamation is not a valid cause of action, and the court upheld the dismissal of one count of a complaint on that basis.

"Publication is an essential element of a claim for defamation. [Citation.] In order to establish publication, there must be a communication of the allegedly defamatory statement to someone other than plaintiff. [Citation.] 'Ordinarily the defendant is not liable for any publication made to others by the plaintiff himself, even though it was to be expected that he might publish it.' [Citation.] Some jurisdictions, however, have held that an exception to this rule exists under certain circumstances, such as where an allegedly defamatory statement made by an employer about an employee was communicated to prospective employers when the employers inquired why the employee had left her previous employment. (See, *e.g., Lewis v. The Equitable Life Assurance Society of the United States* (Minn. 1986), 389 N.W.2d 876; [citations].) Courts dealing with these particular circumstances have recognized that if a defamed person was in some way compelled to communicate the defamatory statement to a third person, and if it was foreseeable to the defendant that the defamed person would be so compelled, then the defendant could be held liable for the defamation." *Layne,* 210 Ill. App. 3d at 975-76, 569 N.E.2d at 1110-11.

The second district court went on to specify three reasons why it would not recognize the theory of compelled self-defamation as a valid cause of action: it might discourage defamed plaintiffs from mitigating their damages, it would unduly burden the free communication of views, and it would unreasonably broaden the scope of defamation liability. (*Layne*, 210 Ill. App. 3d at 976, 569 N.E.2d at 1111.) Plaintiff cited this case to the trial court in its memorandum in opposition to defendant's motion for summary judgment, which was decided by the trial court over three months before the jury trial. The trial court denied defendant's motion for summary judgment, finding in regard to the issue of the theory of compelled self-defamation that the Minnesota case (*Lewis*, 389 N.W.2d 876) was "the better reasoned view than the contrary position" represented by *Layne*.

■ The decision of the Second District Appellate Court was binding authority upon the trial court in the case at bar. At the time of trial, the only Illinois court to rule upon the issue of whether compelled self-defamation was a valid cause of action was the second district in *Layne*. A decision of an appellate court is binding upon all circuit courts of the State, although not binding upon other appellate districts. *State Farm Fire & Casualty Co. v. Yapejian* (1992), 152 Ill. 2d 533, 605 N.E.2d 539.

The trial court should not have disregarded the law of the State as set forth in *Layne*:

"If a trial judge entertains genuine doubt about the continued validity of a reviewing court decision, he may, if he wishes to expedite resolution of the issue in a complex or protracted case, rule in accordance with existing law and then enter the finding required by Rule 304 for an immediate appeal of a final judgment disposing of fewer than all the claims or all the parties in the matter, or certify the particular question for purposes of a permissive interlocutory appeal, as provided by our Rule 308 (134 Ill. 2d Rules 304, 308). Because of our system of precedent, he may not, however, disregard binding authority." *Yapejian*, 152 Ill. 2d at 540, 605 N.E.2d at 542.

There is an additional reason, however, not stated by *Layne*, why compelled self-defamation is not a valid cause of action. Appellate courts should not create new causes of action. Our supreme court and legislature are capable of and primarily responsible for deciding the need for new causes of action. *Ruth v. Benvenutti* (1983), 114 Ill. App. 3d 404, 449 N.E.2d 209.

Finally, even if Kirby had fired plaintiff without giving any reasons, plaintiff would have known that she was being fired due to

the alleged attempted theft, as evidenced by her testimony as to statements she made to co-workers. It is difficult to see how plaintiff was injured more by Kirby giving his reason for firing her than if he had exercised his right to discharge her as an at-will employee without giving any reason at all for the dismissal. Regardless of the reason or nonreason for the discharge, plaintiff would have been confronted with the choice of telling the truth or lying to a potential employer as to why she left Dillard's.

Based upon our ruling that there was insufficient evidence to support the jury verdict as to reckless disregard of plaintiff's rights and that a cause of action based on the theory of compelled self-defamation is not recognized in this State, we need not address defendant's remaining assignments of error. The circuit court's judgment is reversed and this matter is remanded, with the trial court directed to enter a judgment for defendant.

Reversed and remanded with directions.

WELCH and RARICK, JJ., concur.