(No. 74228.—)

LORI KUWIK, Appellee, v. STARMARK STAR MARKETING AND ADMINISTRATION, INC., *et al.*, Appellants.

*Opinion filed July 22, 1993.*

Peterson & Ross, of Chicago (Howard C. Ryan, Joseph J. Hasman and Sherri L. Giffin, of counsel), for appellants.

Maureen Flaherty, of Lehrer, Flaherty & Canavan, P.C., of Wheaton, for appellee.

JUSTICE NICKELS delivered the opinion of the court:

Plaintiff, Lori Kuwik, filed an action in the circuit court of Du Page County against defendants Starmark

Star Marketing and Administration (Starmark), Benefit Trust Life Insurance Company (Benefit), E. Mitsis (Mitsis) and Arthur J. Fischer (Fischer) (collectively, defendants) for libel. The trial court entered summary judgment for all defendants and plaintiff appealed. The appellate court reversed (232 Ill. App. 3d 8), and we granted defendants' petition for leave to appeal (134 Ill. 2d R. 315).

Plaintiff is a doctor of chiropractic medicine and practices at Fox Valley Health Services in St. Charles, Illinois. On February 22, 1989, plaintiff examined Kathy Hammond, who complained of extreme fatigue, recurring bronchitis and tonsillitis, lymphadenopathy, chronic sore throat, and premenstrual syndrome. Plaintiff suspected Candida syndrome and chronic Epstein-Barr virus. On March 6, 1989, plaintiff ordered a series of lab tests which revealed the presence of Candida and Epstein-Barr virus antibodies in Hammond's body.

Hammond submitted her medical bill from plaintiff to Hammond's insurance company, Starmark, for payment. In response, Hammond received a letter from Starmark dated August 15, 1989, signed by Mitsis, which stated in part:

> "This letter is in response to a review on claims submitted from Fox Valley Health Services.
>
> Our Medical Department has reviewed medical records and information relating to services rendered on March 6, 1989. It has been determined that based on the information on file, services rendered are 'outside the scope of the practicing physician's license', [sic] as stated under the definition of a physician in your policy. Therefore no benefits are payable for these services."

The letter also informed Hammond that she could "take this matter up with the Illinois Department of Insurance."

Hammond showed the letter to plaintiff, who subsequently filed a formal complaint with the Illinois Department of Insurance on September 23, 1989. The Department of Insurance forwarded a copy of plaintiff's complaint to Benefit, Starmark's parent company, and requested a response.

On October 23, 1989, Benefit sent the following letter, signed by Fischer, an attorney in Benefit's legal department, to Larry Barregarye of the Department of Insurance:

"Dear Mr. Barregarye:

\*\*\*

In order to respond to the comments of Dr. Lori Kuwik, I had this file reviewed by our medical director, Dr. Marvin Zolot. Dr. Zolot's position is that in order for a provider to order lab tests for a patient, the provider must first determine which test might be appropriate by doing a medical history in performing a physical examination.

In addition the provider must be trained in disciplines which teach the evaluation and treatment of the diseases which the tests may reveal. As our medical director has pointed out, an optometrist would not treat heart disease nor would a physical therapist do any evaluation or investigation into infectious diseases.

Tests for Epstein Barr virus or Systemic Candiasis testing is outside the scope and knowledge as well as the license of the provider in this case. However, our medical director has indicated that the company can provide $35 towards the Epstein Barr Titer and $25 towards the Candida Titer tests for a total of $60 in benefits."

Plaintiff filed her complaint for libel on July 27, 1990, and alleged that defendants' August 15, 1989, and October 23, 1989, letters were false and defamatory with respect to her qualifications to practice her profession. Plaintiff further alleged that defendants maliciously published the letters in an attempt to injure her and ruin her profession.

Fischer was deposed on May 7, 1991, and revealed the following. Fischer is an attorney licensed to practice law in Illinois and is a vice-president, associate general counsel, and assistant secretary at Benefit. Starmark is a wholly owned subsidiary of Benefit, which underwrites Starmark's policies. Starmark employees consult with Benefit's legal and medical departments about pending claims.

Fischer stated that the question of whether a particular physician was operating outside the scope of his license would be answered jointly by the legal and medical departments. Generally, such a decision would not be made by one department alone. Fischer also stated that if an inquiry should be made to him concerning the scope of practice of a chiropractor, he would refer to the licensing statute.

Fischer also noted that he sent Zolot a memo asking him to investigate plaintiff's complaint after Fischer received the inquiry from the Department of Insurance. Zolot responded with this written memo:

"Our position is that in order for a provider to order laboratory tests, they must 1st [sic] determine which laboratory tests might be appropriate by doing a history and performing a physical. In addition, the provider must be trained in disciplines which teach the evaluation and treatment of the disease which the tests may reveal. Optometrists do not treat heart disease; physical therapists do not dabble in infectious disease, et cetera. Epstein-Barr virus + [sic] or systemic Candidiasis is outside the scope of the knowledge and indeed the scope of the license. (Toby is checking the wording of the Chiro license.)"

Fischer explained that "Toby" is Toby Weitzenfeld, a paralegal. Although the memo indicated that Weitzenfeld was checking the wording of a chiropractic license, Fischer never talked to Weitzenfeld about any results of the research. There was also nothing in plaintiff's file

from the paralegal. Fischer could not recall whether he himself researched the Illinois licensing statute for physicians after receiving Zolot's memo, but knew he did not ask anyone to research the matter for him. After the lawsuit was filed, Fischer conducted an investigation and did not find any request of the legal department to provide information concerning licensing procedures for physicians in Illinois in 1989.

Fischer admitted that he based his opinion in the October 23, 1989, letter to the Department of Insurance on Zolot's opinion, and not on the law. Fischer did not know why he did not refer to the Illinois statute before sending the letter to the Department of Insurance. At the time he sent the letter, Fischer believed the statement was true, but has since learned that the statement was not correct. Fischer did not have any knowledge regarding chiropractors' education or licensing at the time the letter was sent, and had no medical training himself. However, Fischer knows now, after researching the licensing restrictions on physicians in Illinois, that the only restrictions on chiropractors at the time the letter was sent concerned dispensing prescriptions and performing surgery. Fischer also learned that a doctor of chiropractic could become licensed to prescribe drugs and perform surgery through further training and examination, and thus become licensed to practice all branches of medicine. Fischer did not look into plaintiff's training.

Fischer also identified the following memorandum concerning Hammond's claim dated August 9, 1989:

> "Per Dr. Zolot's review, no benefits are payable. The tests that were performed are not appropriate treatment for the patients [*sic*] symptoms. The symptoms are not related to spinal manip. treatment. This chiropractor is practicing outside the scope of his license. Deny charges."

On July 11, 1991, defendants filed a motion for summary judgment. This motion was based on defendants' affirmative defense that the two letters were qualifiedly privileged as a matter of law and on the argument that no material fact existed to show the privilege was abused. The trial court agreed with defendants and on September 30, 1991, entered summary judgment as to all defendants.

Plaintiff appealed the trial court's entry of summary judgment, and the appellate court reversed. The appellate court found an issue of material fact concerning whether defendants' statements about plaintiff were made in good faith, a requirement for the finding of a conditional privilege. The appellate court found that the issue was one for the trier of fact. The court also noted that an issue of material fact existed regarding whether the letters were sent with actual malice. 232 Ill. App. 3d 8.

On appeal to this court, defendants argue that the appellate court erred in finding an issue of material fact as to whether they acted in good faith in sending the two letters. Defendants argue that in Illinois, the question of whether a privilege exists is a question of law, and thus, whether good faith existed for the communication to be privileged is also a question of law. Moreover, defendants argue, there is no dispute as to any underlying fact concerning their behavior in sending the letters, and thus there is nothing for the trier of fact to resolve. All the court must do, defendants argue, is look at the undisputed facts and determine whether good faith, and thus a qualified privilege, exist as a matter of law. Defendants argue that the trial court was correct in finding good faith on their part in sending the letters, and a qualified privilege to exist. Defendants also argue

that no issue of material fact exists concerning whether they abused their qualified privilege.

Plaintiff disagrees and argues the appellate court properly found a question of fact to exist as to whether defendants displayed good faith in sending the letters for a conditional privilege to apply. Plaintiff also argues that the appellate court properly found that an issue of material fact existed concerning actual malice.

## I.

### Qualified Privilege

We begin our analysis by discussing the qualified privilege as it currently exists in Illinois defamation law. " 'A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, might be defamatory and actionable ***.' " (*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 349, quoting *Judge v. Rockford Memorial Hospital* (1958), 17 Ill. App. 2d 365, 376.) This privilege is based on the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information. See S. Harper, F. James & O. Gray, The Law of Torts §5.25, at 213 (2d ed. 1986).

The qualified privilege serves to enhance a defamation plaintiff's burden of proof. Where no qualified privilege exists, the plaintiff need only show that the defendant acted with negligence in making the defamatory statements to prevail. (See *Troman v. Wood* (1975), 62 Ill. 2d 184, 198.) However, once a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness. (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 237.) Reckless disregard

as to the matter's falseness has been defined in Illinois as publishing the defamatory matter "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Mittelman*, 135 Ill. 2d at 237-38.

In Illinois, the issue of whether a qualified privilege exists has been a question of law for the court, and the issue of whether the privilege was abused has been a question of fact for the jury. (See *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 631; see also *Zeinfeld*, 41 Ill. 2d at 350 (where this court found a qualified privilege to exist as a matter of law and remanded for a jury determination as to whether the privilege was abused).) A conditional privilege has been found to exist as a matter of law where the following elements are present: (1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only. (*Zeinfeld*, 41 Ill. 2d at 349; see also *Mittelman*, 135 Ill. 2d at 236-37.) Thus, the current Illinois test to determine whether a qualified privilege exists includes not only an inquiry by the court into whether a proper occasion existed which created an interest or duty to make the communication, but also an inquiry by the court into the facts surrounding a defendant's making of the communication.

It is this factual inquiry into the defendants' behavior in making the communications in the instant case, sending the letters, that troubled the appellate court. The appellate court found that the factual inquiry into defendants' good faith, a determination normally made by the court as a matter of law, could not be made by the trial court here because a factual dispute existed. The appellate court thus found the factual inquiry into defendants'

good faith had to be determined by the jury as a question of fact. We too find this aspect of the test for the qualified privilege troubling. We further find another troubling aspect, the two, separate determinations of a defendant's culpability: (1) the finding by the trial court concerning defendant's good faith for the existence of a conditional privilege; and (2) the finding by the jury concerning actual malice.

In determining whether a defendant acted in good faith as a matter of law for the conditional privilege to exist, a court "may consider the face of the report, the occasion on which it was written, conduct of defendant in connection with the report, and the relationship between the publishers and the recipients." (*Edwards v. University of Chicago Hospital & Clinics* (1985), 137 Ill. App. 3d 485, 489, citing *Spencer v. Community Hospital* (1980), 87 Ill. App. 3d 214, 220; *Myers v. Spohnholtz* (1973), 11 Ill. App. 3d 560, 569.) If the court finds a conditional privilege exists, and thus that the communication was made in good faith by a defendant, the jury is then asked to determine whether the defendant abused the privilege by acting in "bad faith," *i.e.*, with actual malice. It is difficult to reconcile a finding by the court that a defendant made a statement in good faith with a finding by the jury that the defendant made the same statement with actual malice.

One case has explained this apparent anomaly by stating that the good-faith inquiry into whether a privilege exists looks to the objective reasonableness of a defendant's conduct in sending the letter (including the investigation as to its truth), while the inquiry into whether a privilege has been abused looks to the subjective knowledge of the defendant in making the statement. (See *Larson v. Decatur Memorial Hospital* (1992), 236 Ill. App. 3d 796, 802-04.) However, the two inquiries necessarily overlap, as a defendant's conduct in making

the statement, including the objective reasonableness of any investigation into the truth of the matter, greatly affects, if not determines, the question of the subjective knowledge of the defendant as to the truth of the defamatory matter. The two inquiries are too similar to justify two separate determinations, one by the judge as a question of law, and one by the jury as a question of fact. Such a process only serves to add confusion to an already confusing area of law.

We find that the approach taken by the Restatement (Second) of Torts in determining whether a conditional privilege exists resolves these troubling aspects of the current Illinois test, and thus adopt the Restatement approach. Under the Restatement (Second) of Torts, a court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged. (See Restatement (Second) of Torts §593 through 599 (1977).) (We note that defendant still has the burden of proving the privilege exists.) This approach resolves the problem the appellate court had by more properly placing factual inquires, such as whether the defendants acted in good faith in making the statement, whether the scope of the statement was properly limited in its scope, and whether the statement was sent only to the proper parties, into the hands of the jury to be determined as questions of fact as to whether the privilege was abused. Such an approach also resolves the problem of having two separate determinations made as to a defendant's culpability by placing the decision solely with the jury.

This approach simplifies this area of the law and is more logical than the previous test. As one treatise has explained in discussing this area of law:

"In determining whether an occasion is privileged, the comparison is to be made between the value of the type of interest involved and the serious character of the *general* kind of harm threatened thereto and the degree of harm to another's reputation normally to be expected from the sort of defamatory matter that would usually be necessary to protect such an interest. In short, the courts here have to deal with the law of *general* averages based on human experience and must shape a *general* policy to deal with a *general* problem. On the other hand, in the question of abuse of privilege, the problem is one of *particulars*. The comparison now is between the value of the specific interest and the precise harm threatened in the particular case on the one hand, and the exact harm likely to result from the defamatory matter actually published." (Emphasis added.) (S. Harper, F. James & O. Gray, The Law of Torts §5.25, at 214 (2d ed. 1986).)

We also note that this approach has been adopted in many other jurisdictions. See *Jones v. Central Peninsula General Hospital* (Alaska 1989), 779 P.2d 783; *Hirsch v. Cooper* (1986), 153 Ariz. 454, 737 P.2d 1092; *Navorro-Monzo v. Hughes* (1989), 297 Ark. 444, 763 S.W.2d 635; *Battista v. Chrysler Corp.* (Del. 1982), 454 A.2d 286; *Nodar v. Galbreath* (Fla. 1984), 462 So. 2d 803; *Arnold v. Diet Center, Inc.* (1987), 113 Idaho 581, 746 P.2d 1040; *Onat v. Penobscot Bay Medical Center* (Me. 1990), 574 A.2d 872; *Mareck v. Johns Hopkins University* (1984), 60 Md. App. 217, 482 A.2d 17; *Bratt v. International Business Machines Corp.* (1984), 392 Mass. 508, 467 N.E.2d 126; *Turner v. Welliver* (1987), 226 Neb. 275, 411 N.W.2d 298; *Erickson v. Marsh & McLennan Co.* (1990), 117 N.J. 539, 569 A.2d 793; *Hitter v. Bellevue School District No. 405* (1992), 66 Wash. App. 391, 832 P.2d 130; *Zinda v. Louisiana Pacific Corp.* (1989), 149 Wis. 2d 913, 440 N.W.2d 548; *Williams v. Blount* (Wyo. 1987), 741 P.2d 595.

Under the analysis just adopted, conditionally privileged occasions have been said to be divided into three classes:

"(1) situations in which some interest of the person who publishes the defamatory matter is involved

(2) situations in which some interest of the person to whom the matter is published or of some other third person is involved

(3) situations in which a recognized interest of the public is concerned." (S. Harper, F. James & O. Gray, The Law of Torts §5.25, at 216 (2d ed. 1986).)

The Restatement (Second) of Torts provides specific examples of occasions when conditional privileges exist, two of which would apply here. Section 594 provides:

"Protection of the Publisher's Interest

An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." (Restatement (Second) of Torts §594 (1977).)

Section 595 provides:

"Protection of Interest of Recipient or a Third Person

(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important interest of the recipient or a third person, and

(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter ***." Restatement (Second) of Torts §595 (1977).

Applying this approach to the instant case, we find that the first letter was sent because of a legal duty (see Ill. Rev. Stat. 1989, ch. 73, par. 766.6(n)), and that both letters were sent on occasions where not only the interests of defendants were involved, but where plaintiff's

and Hammond's interests were involved as well. The letters were sent on occasions where a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information. We thus conclude the two letters were sent on privileged occasions and are, as a matter of law, qualifiedly privileged.

## II.

### Abuse of the Qualified Privilege

The question arises next as to what a plaintiff must prove once the defendant has demonstrated to the court that an occasion was conditionally privileged. In *Mittelman*, this court held that actual malice must be proven by a minimum standard of recklessness once the qualified privilege has been established by the defendant. This inquiry was limited, however, to whether a defendant knew the matter was false or had a high degree of knowledge that the matter was false. Because we now omit several factual inquiries from the former test for the qualified privilege and place them in the hands of the jury, we must expand the definition of abuse of a qualified privilege. We now hold that to prove an abuse of the qualified privilege, the plaintiff must show " 'a direct intention to injure another, or *** a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.' " (*Bratt v. International Business Machines Corp.* (1984), 392 Mass. 508, 514, 467 N.E.2d 126, 131, quoting *In re Retailers Commercial Agency, Inc.* (1961), 342 Mass. 515, 521, 174 N.E.2d 376, 380.) Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties.

## III.

### Summary Judgment

Summary judgment should be granted only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c).) Although "the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit [citation], it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. [Citations.]" *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.

In the instant case, genuine issues as to material facts exist which indicate that defendants' behavior may have been reckless in sending the letters. Concerning the August 15 letter, a question of fact exists as to whether defendants displayed a reckless disregard for plaintiff's rights in not conducting a proper investigation into the truth of their statements concerning plaintiff's knowledge and licensing. Fischer stated that questions concerning licensing of physicians would generally be answered by both the medical and legal departments at Benefit. Here, it appears that only Benefit's medical department made this legal determination. The August 9, 1989, memo concerning Hammond's claim indicates that Dr. Zolot determined that plaintiff was practicing outside the scope of her license, and Fischer stated there was no request of the legal department for information concerning physician's licensing in Illinois in 1989.

Material facts also exist concerning whether the October 23, 1989, letter signed by Fischer was sent with reckless disregard as to plaintiff's rights. Fischer stated

at his deposition that if the issue of the scope of a chiropractor's licensing should be asked of him, he would refer to the licensing statute. However, Fischer could not recall whether he referred to the statute in this instance, but admitted that he did not rely on the statute. If Fischer would have referred to the licensing statute, he would have known that the only restrictions on chiropractors concerned surgery and prescribing drugs, but that a chiropractor could obtain licensing in those areas through more training and certification. (See Ill. Rev. Stat. 1989, ch. 111, par. 4400—15.) Fischer made no inquiry into what type of training and licensing plaintiff had. Moreover, Fischer stated that the decision whether a physician was practicing outside the scope of his license would be made jointly by the medical and legal departments. Yet, Fischer admitted that he sent the letter to the Department of Insurance relying solely on Zolot's opinion, and not the law. Thus, Fischer, an attorney, relied solely on Dr. Zolot's medical opinion concerning the legal issue of licensing. Finally, the memo from Zolot to Fischer regarding Hammond's claim noted that a paralegal was checking the wording of a chiropractor's license, yet Fischer did not inquire as to any results of such research before sending the letter.

Thus, the summary judgment was properly reversed by the appellate court, as issues of material fact are present which must be determined by a jury. The judgment of the appellate court is affirmed.

*Affirmed.*