**Dwaine D. JONES, Plaintiff–Appellant,**

v.

**WESTERN & SOUTHERN LIFE
INSURANCE COMPANY,
Defendant–Appellee.**

No. 95–2691.

United States Court of Appeals,
Seventh Circuit.

Argued March 21, 1996.

Decided Aug. 5, 1996.

Maurice U. Killion, Jr., (argued), Centralia, IL, for Plaintiff–Appellant.

Daniel R. Price (argued), Wham & Wham, Centralia, IL, for Defendant–Appellee.

Before WOOD, Jr., KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Dwaine Jones worked as an income maintenance specialist at the Centralia office of the Illinois Department of Public Aid (IDPA). He was also licensed by the State of Illinois to sell insurance. Although he was not actively engaged in that business, he kept his license current primarily for the purpose

of servicing existing clients. One group of clients, however, was off limits: the public aid recipients who visited Jones in his capacity as an IDPA employee. Among the IDPA's rules governing conduct of employees was Rule No. 8, which prohibits employees from engaging in business with public aid recipients without permission.

This case arose when Gloria James, an acquaintance of Jones (who was dating his brother), purchased a life insurance policy from the Western & Southern Life Insurance Company (Western). James overheard Jones discussing insurance at a restaurant one day, and she asked him what he thought of her policy from Western. Jones told her that he could give her a better deal and promptly did so. He sold her a U.S. Life Insurance Co. policy, and she then canceled the Western policy. At the time of the sale, Jones apparently did not know that James was a public aid recipient.

When Western learned that James had canceled her policy with them, it arranged to have two of its agents, Lindell Furlow and Mark Carney, meet with both Jones and James at the latter's home. During this meeting, Furlow learned that Jones was a full-time employee of the IDPA. He also began to suspect that James was a public aid recipient, noting both the general surroundings and that she lived in a public housing project with her three children. Without looking any further into the question of James' public aid status, Furlow reported his suspicions to his boss, Ron Germann. Germann in turn called the Centralia office of the IDPA and asked if Jones worked there; the person answering the telephone neither confirmed nor denied Jones' employment status. Germann then telephoned the IDPA Chief of Internal Affairs, Jerry Donovan. Donovan asked Germann to write him a letter regarding Jones and the insurance question, which Germann did. The letter stated that "[w]e suspect that Mr. Jones is selling insurance to public aid recipients while working for the Department," and it named James as a person whose policy had been replaced by Jones. Germann also sent a copy of the letter to the Illinois Department of Insurance (DOI).

After the IDPA and DOI received Germann's letter, the state initiated a criminal investigation of Jones—a fact which Jones' supervisor announced to some 20 to 24 people at a staff meeting. Jones was subsequently shunned at work and suffered from fatigue and anxiety. He also alleged that, but for the difficulties in Illinois, he would have been able to take a job managing the business concerns of Dr. James C. Moore in Warner–Robbins, Georgia, at a salary of $125,000 per year. With the exception of the alleged lost job opportunity, matters in the end were apparently resolved rather favorably to Jones. Though Donovan concluded that Jones violated IDPA Rule 8 by selling James the U.S. Life Insurance policy, Jones was not demoted or disciplined, received the normal raises he would have expected, and, so far as the record shows, continues to work at IDPA.

Jones brought this action on May 18, 1992, in the Southern District of Illinois, relying on diversity jurisdiction. Counts I and II of his complaint alleged that on May 22, 1991, Western defamed him by orally communicating to IDPA that Jones was using an IDPA database to obtain the names of potential insurance customers and that he was intimidating IDPA clients into purchasing insurance. Counts III and IV alleged that on May 23, 1991, Western's agent Germann sent a defamatory letter to IDPA and to the DOI, which stated that while employed by IDPA, Jones sold insurance to welfare recipients (plural). The letter also allegedly implied that Jones was unfit to serve as an IDPA caseworker or insurance agent in Illinois, and that he had committed the criminal offense of Official Misconduct (a Class 3 felony). 720 ILCS 5/33–1 et seq.

After a trial on the merits, Counts III and IV (the letter counts) were submitted to the jury. The jury awarded Jones $5,000 in compensatory damages and no punitive damages. After the district court denied his motion for new trial on the grounds of insufficiency of the jury verdict, Jones appealed. Before this Court, he asserts both that the jury was improperly instructed on the defense of qualified privilege and the status of lost wages as an element of damages and

that the judge should have admitted Western's annual financial statements into evidence. Jones also argues that the district court should have granted judgment as a matter of law in his favor or ordered a new trial.

Initially, it is worth noting who is appealing and why. Jones, after all, prevailed at the trial, and his arguments on appeal boil down to the proposition that he should have won more money than he did. Western, for its part, did not file a cross appeal, presumably because it was happy to have the case over with for the relatively modest sum of $5,000. Thus, it is the "loser" who is defending most of the proceedings below before us, and the "winner" who is complaining. With that in mind, we consider first Jones' arguments about the jury instructions, and then we turn to his evidentiary arguments. .

■ Illinois law governs Jones' action for libel. The key issue here was whether Germann's letter to the IDPA and the DOI was protected by a qualified privilege, and if so, whether the privilege was abused. The governing Illinois decision on this issue is *Kuwik v. Starmark Star Marketing and Administration, Inc.*, 156 Ill.2d 16, 188 Ill.Dec. 765, 619 N.E.2d 129 (Ill.1993). In *Kuwik*, the Illinois Supreme Court explained that the qualified privilege in defamation law is based on "the policy of protecting honest communications of misinformation" in order to facilitate the availability of correct information. *Id.* 188 Ill.Dec. at 769, 619 N.E.2d at 133. Where no privilege exists, "the plaintiff need only show that the defendant acted with negligence in making the defamatory statements to prevail." *Id.* However, "once a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness." *Id.*

■ The *Kuwik* Court adopted the approach of the Restatement (Second) of Torts, §§ 593–599 (1977), as to the allocation of responsibility between the judge and the jury in this process. The court looks only to the occasion itself for the communication and decides as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication privileged. The *Kuwik* Court identified three general situations in which conditionally privileged occasions arise: (1) some interest of the person who publishes the defamatory matter is involved, (2) some interest of the person to whom the matter is published or of some other third person is involved, and (3) a recognized interest of the public is concerned. *Id.* at 771, 619 N.E.2d at 135. If the party asserting the privilege satisfies its burden, the factual questions relating to abuse, such as the defendant's good faith, the scope of the statement, and the defendant's choice of recipient, are left for the jury to determine. *Id.* at 770, 619 N.E.2d at 134.

■ During the trial it became clear that Western had brought forward enough evidence to raise the issue of qualified privilege. Using the *Kuwik* analysis, the district court decided that one of the "occasions" for the privilege was present, and the question whether Western had abused the privilege was submitted to the jury. The fact that the jury awarded Jones $5,000 can mean only one thing: the jury agreed with Jones, not Western, that the privilege was abused. Given this outcome, any error in the instructions regarding the existence of a qualified privilege could not have been prejudicial to Jones. We therefore see no need to delve any further into this subject.

■ The district court's decision regarding the admissibility of the exhibit containing Western's annual statements filed with DOI for 1992, 1993, and 1994 can also be dealt with in short order. The court ruled that the exhibit did not present competent evidence of net worth, it was needlessly confusing, and it required expert interpretation. The court also stated that the statements contained a great deal of irrelevant financial data and would have prejudiced the defendant. Jones, for his part, never asked Western to produce any financial statements, nor did he try to make the DOI forms more comprehensible. He did not proffer a CPA to explain the statements until after he had closed his case. Under the circumstances, the district court was well within the bounds of its discretion in

ruling both to exclude the exhibit and not to re-open the case for the CPA. The district court's reasons were perfectly valid under Rule 403, and no one prevented Jones from introducing other evidence.

With respect to the lost job opportunity with Dr. Moore in Georgia, Jones is under the misapprehension that he did not need to prove that the job either existed or was worth any particular amount of money in order for this question to be submitted to the jury. Under Illinois defamation law, certain types of damages can be submitted to the jury as general damages while other forms of damages must be proven. The district court here instructed the jury to presume, if it found Western abused its privilege, that Jones suffered general damages, defined as "personal humiliation, embarrassment, injury to reputation and standing in the community, mental suffering, and anguish and anxiety." This list correctly reflects Illinois law, which allows a plaintiff to recover general compensatory damages (including non-quantifiable damages like humiliation or anxiety) under the doctrine of presumed damages. *Swick v. Liautaud,* 169 Ill.2d 504, 215 Ill.Dec. 98, 105, 662 N.E.2d 1238, 1245 (1996); *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1138 (7th Cir.1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). Illinois law does not, however, allow for recovery of economic damages, such as lost employment opportunities, unless these damages are pleaded and proven as special damages. *Brown & Williamson,* 827 F.2d at 1138. Otherwise plaintiffs could make up practically any number and call it presumed damages. How do we know Dr. Moore was going to pay Jones only $125,000? Why not $150,000, or $500,000? With nothing but Jones' own testimony, both with respect to the existence of the job opportunity itself and with respect to the amount of money it was worth, the district court correctly refused to submit this item of damages to the jury.

Jones' last points assert that the district court should have granted judgment as a matter of law on his behalf, or failing that, his motion for new trial. It is pellucidly clear that Jones was not entitled to judgment as a matter of law: such a judgment is proper only if reasonable persons could not find that the evidence could support a decision for a party on each essential element of the case, viewing the evidence in the light most favorable to the opponent of the motion. *See Mayer v. Gary Partners & Co.,* 29 F.3d 330, 335 (7th Cir.1994); *Jackson v. Bunge Corp.,* 40 F.3d 239, 242 (7th Cir.1994). We are also unprepared to say that the district court abused its discretion in refusing to grant a new trial based on the inadequacy of the damages awarded or any of the other grounds Jones asserts. Another jury might not be as kind as this one was. The jury gave him a moral victory that vindicated his reputation, and a little money in addition to acknowledge the hardship that an attack on one's reputation entails. Jones has raised nothing before us that persuades us he was entitled to more.

The judgment of the district court is AF-FIRMED.