2026 IL App (1st) 241183-U

FIRST DISTRICT
SECOND DIVISION
March 31, 2026

No. 1-24-1183

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PRESTON WOLIN, M.D., | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County, Illinois |
| | ) | |
| vs. | ) | No. 2020-L-009762 |
| | ) | |
| DAVID HOFFMAN, M.D., | ) | Honorable Daniel J. Kubasiak |
| | ) | Judge Presiding |
| Defendant-Appellee. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held:* Reversed and remanded. Though defendant doctor's statement was protected by qualified privilege, question of fact remains as to whether privilege was abused.

¶ 2     This is a defamation case between doctors. Defendant, Dr. David Hoffman, an orthopedic surgeon at St. Joseph's Hospital, was called to consult on an orthopedic surgery already in progress with the understanding that an emergent patient health crisis had arisen. The principal surgeon in the operating room was plaintiff, Dr. Preston Wolin. Plaintiff claims that, after defendant entered the operating room and sized up the situation, he stated that plaintiff had "lacerated [the patient's] axillary artery." That statement was false, says plaintiff, and defamatory *per se* at that.

¶ 3     Defendant does not admit making the statement. But he moved for summary judgment,

claiming that the alleged statement, made during an emergent medical situation, was protected by qualified privilege. The circuit court agreed and entered summary judgment for defendant.

¶ 4     We likewise agree that the statement was protected by a qualified privilege. But a qualified privilege can be abused, and plaintiff argues that a question of fact exists as to whether defendant abused the privilege here. On that point, we agree that a question of fact exists. So summary judgment was improper. We reverse the judgment and remand for further proceedings.

¶ 5                                  BACKGROUND

¶ 6                               I. Factual History

¶ 7     Plaintiff is an orthopedic surgeon who had staff and operating privileges at St. Joseph Hospital in Chicago. Defendant is an orthopedic surgeon and, at all relevant times, was the chief of orthopedic surgery at St. Joseph.

¶ 8     On October 11, 2019, plaintiff began a right arthroscopic rotator cuff reconstruction on a 60-year-old patient at St. Joseph. The anesthesiologist, Dr. Annette Martini, who was separated from the patient and surgeons by a drape, became concerned over the patient's blood loss and "precipitous" drop in blood pressure. After administering medication to relieve the blood pressure to no avail, Dr. Martini looked around the drape and saw "blood streaming down the patient's arm." She inquired of plaintiff, the lead surgeon, who told her he was seeing no blood in his scope. Dr. Martini asked the circulating nurse to call for assistance.

¶ 9     Dr. Shesh Rao, the chief medical officer at St. Joseph, received a "frantic phone call" from the operating room. Dr. Rao was told something to the effect of, "we need help" and "get somebody else in here, please." Not a surgeon himself, Dr. Rao tried to contact the chief of surgery (Dr. Mark Connolly) and the chief of orthopedic surgery—defendant.

¶ 10    Dr. Rao ran into defendant in the hallway and told him of the phone call. He asked

defendant to go the operating room and "see what you can do" or "see what's needed." Dr. Rao later found Dr. Connolly, the surgery chief, who told Dr. Rao that he had already sent a vascular surgeon to the operating room.

¶ 11    Defendant, in his deposition, described running into Dr. Rao, who told him that "there is a problem with [plaintiff's] surgery in Surgery 11, would I go in[?]" He does not recall Dr. Rao telling him what, precisely, the problem was.

¶ 12    As defendant arrived at the operating room, Dr. Connolly (the chief of surgery) was just leaving. Dr. Connolly told defendant "that Dr. *** Matthew Blecha, who is a vascular surgeon, was already in to see the patient and left. He had gone in to see the patient, checked the pulses. Everything was fine. And Dr. Martini had terminated the surgery or called for termination of the surgery because she could not control the blood pressure, and then he left."

¶ 13    Dr. Connolly also told defendant that "there was no vascular injury, obvious vascular injury." When pressed to put a finer point on it, defendant testified that "Dr. Connelly said Dr. Blecha had examined the patient, was satisfied that there was no axillary artery injury and left."

¶ 14    Dr. Connolly told defendant that he, Dr. Connolly, had also been in the operating room. According to defendant, Dr. Connolly told him that "he felt good peripheral pulses; therefore the axillary artery should not have been lacerated."

¶ 15    Plaintiff, for his part, remembered a different vascular surgeon—a Dr. Robinson—entering the operating room, but he recalled the surgeon examining the patient and stating, for all present to hear, that there was "no evidence of a vascular injury," which plaintiff took to mean that "there had been no lacerations or cuts to arteries or veins or any kind of vessels."

¶ 16    Plaintiff testified that, when defendant entered the operating room, he stated that plaintiff "lacerated the patient's axillary artery." (Plaintiff would later testify that defendant may have

used the word "cut," not "lacerated.") Plaintiff denied that accusation and pointed out that the vascular surgeon had just concluded that the axillary artery had not been lacerated. Plaintiff recalled that Dr. Connolly (whom, by plaintiff's recall, was also present at that time) followed up with the question, "Maybe the vein?" Plaintiff answered no to that question as well.

¶ 17    Defendant and plaintiff then moved into an anteroom of the operating room, at which point, according to plaintiff, defendant continued to disparage his professional qualifications. But none of those statements are relevant to this appeal, so we need not dwell on them.

¶ 18    Defendant, in his deposition, denied accusing plaintiff of lacerating the axillary artery. He testified that "it never happened," that it was "[a]bsolutely false." He denied ever using the words "cut" or "laceration" or "vascular" during the conversation with plaintiff in the operating room. He agreed that, before he walked into plaintiff's operating room, he had been made aware (by Dr. Connolly) that "vascular surgery had ruled out a vascular injury."

¶ 19                                II. Procedural History

¶ 20    Plaintiff sued defendant, among other things, for defamation. As only the defamation claim in count I is at issue on appeal, we focus on those allegations only.

¶ 21    The complaint alleged that defendant defamed plaintiff by stating, in front of other medical professionals in the operating room, that plaintiff had "lacerated the patient's axillary artery." After motion practice and discovery, defendant moved for summary judgment, claiming his allegedly defamatory statement, assuming he made it, was subject to a conditional privilege. The circuit court agreed and entered summary judgment for defendant. This appeal followed.

¶ 22                                    ANALYSIS

¶ 23    Plaintiff claims the trial court erred in determining that a conditional privilege protected defendant's alleged defamatory statement; at a minimum, he says, a question of material fact

remains, precluding summary judgment. He also argues that, even if a conditional privilege applied here, there is a question of fact as to whether defendant abused that privilege.

¶ 24                                    I. Standard of Review

¶ 25    Plaintiff's principal argument on appeal is that the trial court's factual findings were against the manifest weight of the evidence. So before we reach the merits, a few words on summary judgment and our standard of review are necessary.

¶ 26    It is long settled that our review of summary judgment is *de novo*; we show no deference to the circuit court and decide the question as if we were the trial court. *Piasa Armory, LLC v. Raoul*, 2025 IL 130539, ¶ 12; *People v. McDonald*, 2016 IL 118882, ¶ 32. It is equally bedrock law that the purpose of summary judgment is not to *make* factual findings but to determine *whether* a dispute of material fact exists; if so, summary judgment is inappropriate, but if there is no dispute over the facts material to the outcome, we need only apply the law to those undisputed facts, and summary judgment may be appropriate. *Andrews v. Carbon on 26th, LLC*, 2025 IL 130862, ¶ 20; *Adames v. Sheahan*, 233 Ill. 2d 276, 295 (2009).

¶ 27    Manifest-weight review has no place in a review of summary judgment. That standard of review is appropriate when the court hears live testimony—observing the witness's demeanor and making credibility determinations—and then makes findings of fact. *People v. Morgan*, 2025 IL 130626, ¶ 21. We defer to the trial court's factual findings because it is in a superior position to evaluate credibility and resolve conflicts in the evidence. *Id*.

¶ 28    But that would not describe a summary judgment proceeding; that would describe a trial or at least some form of evidentiary hearing. The whole point of summary judgment—emphasis on *summary*—is that no trial or evidentiary hearing is necessary, because the parties do not dispute the facts, at least not the ones that matter to the outcome. So the evidence presented to

the court, as here, is not live testimony but deposition transcripts, affidavits, and other forms of documentary evidence. *Adames*, 233 Ill. 2d at 295; 735 ILCS 5/2-1005(c) (West 2024).

¶ 29    Said differently: the circuit court here made no factual findings. The court did not listen to the testimony of plaintiff, defendant, and other witnesses, observe their demeanor, and gauge their credibility before deciding which facts were true and which were not. The court merely recited the facts from deposition transcripts and concluded that the parties did not dispute any fact material to the outcome of the case. Then the court applied the law to those undisputed facts.

¶ 30    We can perform precisely the same function on review. We can read the deposition transcripts. We can determine whether a dispute of material fact exists. And if no dispute of material fact exists, we can apply the law. That is why our review is *de novo*.

¶ 31    Plaintiff's larger point is not lost on us, no matter the standard of review he cites. He says disputes of material fact exist, precluding summary judgment. But we will decide if he is correct on our own, independently, without deference to the trial court.

¶ 32                                   II. Qualified Privilege

¶ 33    A claim sounding in defamation requires proof that "(1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the publication caused damages." *project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 20; *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 26.

¶ 34    As our appeal concerns qualified privilege, we raise one preliminary note. The supreme court, as quoted above, includes in the elements of a defamation claim that the defamatory statement was "unprivileged." Yet *Dent* stated that a qualified privilege is an affirmative defense. See *Dent*, 2022 IL 126795, ¶¶ 35, 46. Both things cannot be true; either the lack of a privilege is an element the plaintiff must prove, or the existence of a privilege is an affirmative defense the

defendant must prove. The appellate courts have viewed qualified privilege as an affirmative defense and have noted this " 'quirk' " in the law before. *Kainrath v. Grider*, 2018 IL App (1st) 172270, ¶ 34 (quoting *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 25 n.2); see *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 870 (1995).

¶ 35     Here, however, that distinction makes no difference to our disposition, as we find the existence of a qualified privilege as a matter of law.

¶ 36     Defendant says his alleged statement to plaintiff in the operating room was protected by a qualified privilege, sometimes called a "conditional" privilege. A defamatory statement may be protected by a qualified privilege, depending on the occasion in which, or the circumstances under which, it is made. *Id.* ¶ 30. Illinois public policy protects honest communications of misinformation in certain contexts to promote the availability of correct information. *Id.*

¶ 37     If a defendant establishes a qualified privilege, a plaintiff must prove that the defendant abused that privilege by directly intending to injure the plaintiff or recklessly disregarding the plaintiff's rights and the consequences that might result to the plaintiff. *Id.* The existence of a privilege is a question of law for the court. *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 25 (1993); *Kainrath v. Grider*, 2018 IL App (1st) 172270, ¶ 45. (Though, of course, a question of fact could preclude that legal determination at summary judgment.)

¶ 38     There is no fixed formula for determining the existence of a qualified privilege. "[A] court looks only to the occasion itself for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwik*, 156 Ill. 2d at 27. Our supreme court recognizes three classes of conditional privilege:

> (1) situations in which some interest of the person publishing the defamatory matter is involved;
>
> (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved; and
>
> (3) situations in which a recognized interest of the public is concerned.

*Dent*, 2022 IL 126795, ¶ 31; *Kuwik*, 156 Ill. 2d at 28-29.

¶ 39     For example, workplace harassment allegations were protected by a qualified privilege. *Dent*, 2022 IL 126795, ¶ 35. The supreme court reasoned that employers had a legal obligation and a compelling interest to investigate workplace harassment, and witnesses should not be unduly deterred from participating in investigations by fear of defamation liability. *Id*. ¶¶ 35-38.

¶ 40     In the realm of health care, our courts have generally respected the need of medical professionals to communicate with frankness and candor, for reasons that are obvious. For example, qualified privilege protected two letters from a defendant insurance company, one to the insured and one to the state insurance agency, indicating that the plaintiff chiropractor was not qualified to perform certain diagnostic tests. *Kuwik*, 156 Ill. 2d at 30. Our supreme court reasoned that the insurer's letter to the insured was compelled by law, and both letters concerned the interests of the insurer, the insured, and the plaintiff chiropractor. *Id*. As the court put it, "[t]he letters were sent on occasions where a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information." *Id.* at 30.

¶ 41     *Barakat v. Matz*, 271 Ill. App. 3d 662, 664 (1995), involved a defamation suit by one doctor, who treated two worker's compensation claimants, against another doctor who was retained by the insurance company to review the plaintiff doctor's recommendations for medical treatment. The defendant doctor's reports to the insurer, which were highly critical of the

plaintiff, were protected by a qualified privilege, as the report involved "some interest of the person to whom the matter is published," the second class of conditional privilege mentioned in *Kuwik*. *Id*. at 669. We explained that "the worker's compensation insurers *** clearly have an interest in determining the validity of worker's compensation claims." *Id*.

¶ 42    A report prepared by a physician and a director of a hospital, finding the plaintiff doctor had engaged in "serious breaches of accepted medical practice" and whose medical care "poses a serious threat to the life and health of hospital patients," was protected by qualified privilege. *Spencer v. Community Hospital of Evanston*, 87 Ill. App. 3d 214, 219 (1980). In our view, "[t]he hospital had a strong interest in ascertaining the quality of medical care rendered by its admitting physicians," and the defendants "each were required to assess this matter fully and frankly in discharge of their duty to comply with the board's direction to investigate and report." *Id*.

¶ 43    We applied a qualified privilege to a medical diagnosis that a hospital provided to a health insurer. *Edwards by Phillips v. University of Chicago Hospitals & Clinics*, 137 Ill. App. 3d 485, 490 (1985). The diagnosis "was directly related to [the hospital's] legitimate purpose in submitting the insurance claim forms" and was "communicated on a proper occasion in a proper manner and was sent only to the persons authorized" to receive the information. *Id*.

¶ 44    Again, we are required to "look[] only to the occasion itself for the communication" in determining whether "the occasion created some recognized duty or interest to make the communication so as to make it privileged." *Kuwik*, 156 Ill. 2d at 27. Focusing on the occasion itself, it is clear that a qualified privilege protected defendant's statements in the operating room to plaintiff.

¶ 45    No matter how plaintiff tries to nip at the margins, it is undisputed that defendant was sent to that operating room because of an emergent problem involving patient health. It is

difficult to imagine a situation where frankness and candor are more critical. An operating room where a patient is failing is no place for carefully chosen words or concern for one's feelings; it is a place "where a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information." *Kuwik*, 156 Ill. 2d at 30.

¶ 46    Plaintiff's attempt to inject questions of fact into this analysis are unpersuasive. It may be true that defendant did not know the specific problem the patient was suffering—that the patient was bleeding out. But defendant, a senior surgeon, was not rushing to an operating room to help fix plaintiff's necktie or have a casual chat; he was responding to a surgical patient in crisis. That is all he needed to know, and that is all we need to know.

¶ 47    It may also be true that much of the emergency had abated by the time defendant arrived. That will be relevant to the question of abuse of privilege we consider next, but here we are talking about a legal question of privilege that focuses on the occasion itself. *Id*. at 27. We are extremely reluctant to split hairs in the context of an emergency medical response—it was "this much" of an emergency or "kind of" an emergency "but not really." The law should leave no room for doubt: if a doctor is summoned to an operating room in an emergent patient crisis, that doctor must have some freedom to make statements that later prove to be untrue.

¶ 48    A qualified privilege protected defendant's statement to plaintiff in the operating room.

¶ 49                              II. Abuse of Privilege

¶ 50    A defendant abuses a qualified privilege if he directly intended to injure the plaintiff or uttered the statement in reckless disregard of the plaintiff's rights and the consequences that might result to the plaintiff. *Dent*, 2022 IL 126795, ¶ 30. "Reckless disregard as to the matter's falseness has been defined in Illinois as publishing the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Kuwik*, 156 Ill. 2d

at 24-25 (internal quotation marks omitted). Whether a privilege has been abused is ordinarily a question of fact. *Id*. at 25; *Barakat*, 271 Ill. App. 3d at 669.

¶ 51    As in any other context on a review of summary judgment, we will examine the facts in the light most favorable to the non-movant—plaintiff here—and draw all reasonable inferences in his favor. *Andrews*, 2025 IL 130862, ¶ 20. Which means, for starters, that we assume that what plaintiff swore in his deposition is true—that defendant said to plaintiff, inside the operating room with other medical professionals present, that plaintiff lacerated the patient's axillary artery. It also means that we must draw all reasonable inferences in plaintiff's favor when evaluating the remainder of the evidence to determine abuse of privilege.

¶ 52    Defendant testified that, as he arrived outside the operating room, the chief of surgery, Dr. Connolly, told him several things: (1) a vascular surgeon had examined the patient and found no vascular injury, that the vascular surgeon "had examined the patient" and "was satisfied that there was no axillary artery injury;" (2) Dr. Connolly, himself, had examined the patient and "felt good peripheral pulses; therefore the axillary artery should not have been lacerated;" and (3) the surgery was ending, aborted because of the unstable blood pressure and blood loss.

¶ 53    It is a more than reasonable inference that, by the time he entered the operating room, defendant had ample reason to believe that plaintiff had *not* lacerated the patient's axillary artery. And yet, construing the evidence most favorably for plaintiff, he accused plaintiff of doing so, anyway. Said differently, it is a reasonable inference that defendant leveled the accusation at plaintiff "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth" (*Kuwik*, 156 Ill. 2d at 25), if not outright intending to hurt plaintiff's reputation.

¶ 54    A reasonable trier of fact could find that defendant abused his qualified privilege. The existence of a triable fact on this question renders summary judgment inappropriate.

¶ 55    We cannot emphasize enough that we are making no factual findings; we are not saying which facts are true or untrue. We recognize that defendant denies making this accusation and, indeed, the fact that he had good reason to believe it wasn't true, based on what Dr. Connolly had told him, is evidence that he never would have uttered those words in the first place. Fair enough. But that cuts the other way, too—the fact that he had good reason not to believe it but said it, anyway, could reasonably be viewed as a reckless disregard for plaintiff's reputation, if not a direct intention to damage plaintiff's reputation.

¶ 56    Because we must interpret the facts and draw all reasonable inferences in favor of plaintiff at this stage, we find a question of fact as to whether defendant abused his qualified privilege. That determination, in this case, must be made by the fact finder and not by the court as a matter of law. See *Anderson v. Beach*, 386 Ill. App. 3d 246, 253 (2008). Summary judgment was inappropriate.

¶ 57                              CONCLUSION

¶ 58    We uphold the trial court's legal conclusion that defendant's statements inside the operating room were protected by a qualified privilege. But we find a question of material fact exists as to whether defendant abused that privilege. We reverse the grant of summary judgment and remand for further proceedings.

¶ 59    Reversed and remanded.