In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3775, 99-3895

Don Campbell a/k/a Donald Lee,

Plaintiff-Appellee/Cross-Appellant,

v.

Howard Peters III, John Groves, and
Charles Williams,

Defendants-Appellants/Cross-Appellees,

and

Michael O'Leary, Michael Lane, and Carol Mills,

Defendants/Cross-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 92 C 3265--Ann Claire Williams, Judge.

Argued October 30, 2000--Decided July 10, 2001


   Before Ripple, Diane P. Wood, and Evans,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  In July of
1990, an Illinois Circuit Court decided
that appellant Donald Campbell was kept
in prison at least a year longer than his
sentence required. Campbell subsequently
sued six prison officials and the
Illinois Department of Corrections (IDOC)
alleging violations of his Eighth and
Fourteenth Amendment rights. A jury found
in his favor against three of the
defendants, and those defendants now
appeal that finding, claiming that they
were entitled to qualified immunity.
Campbell cross-appeals the court's grant
of summary judgment in favor of the other
three defendants. While we affirm the
district court's decision with respect to
the cross-appeal, we find that the three
remaining defendants were indeed entitled
to judgment as a matter of law based on
the defense of qualified immunity. We
therefore reverse the jury verdict and
remand to the district court to enter
judgment as a matter of law in the
defendants' favor.

I

A. Campbell's Prison Sentences

On November 10, 1981, Campbell (who has also used the monikers "Tony Redfield," "Donald Lee," "Donald Shelton," and "Rodney Lee") was convicted in the state of Michigan of breaking and entering and given a prison sentence of one and a half to 15 years. After serving only about three months, he escaped from a halfway house. The governor of Michigan issued an escape warrant for his arrest, but Campbell evaded the Michigan police.

In October of 1983, law enforcement officials caught up with him in Illinois, where he was apprehended on charges of residential burglary. He was convicted of that offense and sentenced to a prison term of four and a half years plus a two-year mandatory supervised release (MSR) term. Campbell was released from prison in February 1986 (about 25 months early), based on good conduct credit that he had earned, and he began serving the MSR term. But on July 23, 1986, after serving only about six months of MSR, he was arrested yet again for unlawful use of a weapon by a felon and on December 10, 1986, was sentenced to a two-year prison term, with credit for time served since July 23.

Because of the weapons conviction, the Prisoner Review Board (Board) revoked Campbell's burglary MSR on January 6, 1987. Campbell was ordered to serve the time remaining on his two-year MSR term (about 18 months) in prison. This computation was in accordance with 730 ILCS sec. 5/3-3-9 (West 2000), which states that for MSR violators, recommitment "shall be for the total mandatory supervised release term, less the time elapsed between the release of the person and the commission of the violation for which the mandatory supervised release is revoked." sec. 5/3-3-9(a)(3)(i)(B). The statute at that time also allowed the Board to revoke up to a year of the good conduct credit earned during the burglary sentence and to add another year to the MSR term. Id.

In apparent keeping with these rules, Campbell was ordered reincarcerated for 18 months. At that time, the Board did not order Campbell to serve any of the 25

months that had been deducted from his sentence on the burglary charge because of his good conduct credits (although the statute would have permitted it to add on another 12 months to the 18 month sentence).

Because the new 18 month term was to be served concurrently with the 24-month unlawful use sentence, Campbell's initial projected release date was July 23, 1988. This changed, however, in response to a number of offenses Campbell committed after his return to prison (including arson, assaulting an officer and other inmates, property damage, and possession of gang-related material). When all was said and done, the Board revoked all of the good conduct credits Campbell had earned earlier while serving the burglary sentence. The net result was a new release date of March 29, 1990.

Matters became even more complicated when the Board decided that the four and a half months Campbell had spent in jail awaiting sentence on the unlawful use charge could not be credited against the original six and a half year burglary sentence. This had the effect of pushing his release date back to August 16, 1990. The Board made this decision in reliance on 730 ILCS sec. 5/3-3-9(a)(3)(ii), which states that in computing the sentence of an MSR violator, the person shall be given credit against the term of reconfinement for time spent in custody subsequent to his parole only if that time has not been credited against another sentence. See also Jackson v. Fairman, 418 N.E.2d 200 (Ill. App. Ct. 1981).

By March of 1987, Campbell was starting to wonder when he could expect to be released. He made a few inquiries, but he did not receive consistent stories about his projected release date. At some point, he wrote or spoke to each of the following individuals, asking for a clarification of the calculation of his sentence. Michael Lane, the IDOC director, gave him an explanation on at least two separate occasions. John Groves, the chief records officer for IDOC, reviewed the calculations at least twice. Statesville Warden Michael O'Leary and Pontiac Correctional Center Warden Howard Peters III referred him to their respective records clerks, Carol Mills and Charles Williams, each of whom

explained the sentence calculations to Campbell at least twice.

In the meantime, dissatisfied with the explanations he was receiving and suspecting that the prison officials were not allowed to revoke the previously earned good conduct credits, Campbell filed a habeas corpus petition in state court on April 8, 1988, against Statesville Warden O'Leary, contending that his release date should have been no later than July 23, 1988, and that O'Leary erred in calculating a projected discharge date of August 16, 1990. The Will County Circuit Court dismissed this petition on September 2, 1988, but on June 21, 1989, the Illinois Appellate Court reversed the dismissal. The Appellate Court held that the record did not adequately explain why four and a half months had been added to the six and a half year burglary sentence, and it remanded the case to the trial court for a more detailed hearing.

This hearing was continued several times. Ultimately, Campbell's petition was dismissed again by the Circuit Court on May 31, 1990. On July 11, 1990, the Illinois Appellate Court asked the Circuit Court to conduct another hearing on the petition and ordered Campbell to be released on bond. On July 30, 1990, the Circuit Court decided that Campbell's burglary sentence should have ended no later than June 1989 because the statute allows the Prison Review Board to revoke only one year's worth of good conduct credit. The court then ordered Campbell's immediate release from custody.

Campbell undoubtedly thought that he had finally prevailed, but that was not to be the case as a practical matter. When Williams began to process Campbell's release on July 11, he discovered a successor to the old Michigan escape warrant for Campbell's arrest, which had been issued March 24, 1987. As a result, Campbell's Illinois victory did not result in his actual release, but instead simply caused him to be transferred to the Livingston County Sheriff and turned over to the custody of Michigan in September. Michigan gave Campbell credit for time served in Illinois and he was released by Michigan authorities on April 1, 1991.

B.  District Court Proceedings

In May of 1992, Campbell filed a sec. 1983 suit against IDOC and the six individuals described above: Groves, Lane, O'Leary, Mills, Peters, and Williams. Campbell claimed that these defendants had wrongfully detained him in violation of his Eighth and Fourteenth Amendment rights. In particular, he claimed that he should have been released from prison on July 23, 1988, but that he had been held for two extra years because his good conduct credit was unlawfully revoked after his recommitment. He sought $5 million in damages from each defendant.

The defendants filed several pre-trial motions for summary judgment. In response, the district court took several actions. It dismissed all of Campbell's Fourteenth Amendment due process claims. Then it granted summary judgment in favor of Lane, O'Leary, and Mills ("the Lanedefendants") because the undisputed facts did not support a finding of an Eighth Amendment violation. The court also granted summary judgment for IDOC based on the state's Eleventh Amendment immunity.

This left the Eighth Amendment case against Groves, Peters, and Williams ("the Groves defendants"), which went to a jury trial. At the close of evidence, the defendants moved for judgment as a matter of law based on qualified immunity. The court denied that motion, and the jury found in Campbell's favor, awarding $37,000 in compensatory damages and $5,000 in punitive damages from each defendant. The defendants renewed their motion for judgment as a matter of law and moved for a new trial. These motions, too, were denied.

The Groves defendants appealed the district court's refusal to grant them judgment as a matter of law. Campbell filed a cross-appeal, challenging the dismissal of his Fourteenth Amendment claims and the grant of summary judgment in favor of the Lane defendants. The two appeals have been consolidated.

II

We review a district court's refusal to

grant a Rule 50 motion for judgment as a matter of law de novo. Sheehan v. Donlen Corp., 173 F.3d 1039, 1043 (7th Cir. 1999). Judgment as a matter of law is proper only if a reasonable person could not find that the evidence supports a decision for a party on each essential element of the case, viewing the evidence in the light most favorable to the nonmovant. Jones v. Western & Southern Life Ins. Co., 91 F.3d 1032, 1036 (7th Cir. 1996). We also review the district court's denial of qualified immunity de novo, taking the facts in the light most favorable to Campbell and looking only at the legal questions. Khuans v. School Dist. 110, 123 F.3d 1010, 1013 (7th Cir. 1997).

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Anderson v. Creighton, 483 U.S. 635, 640 (1987). In general, once the defendants raise the qualified immunity defense, the plaintiff must show two things: first, that there has been a violation of one or more of her federal constitutional rights, and second, that the constitutional standards at issue were clearly established at the time of the alleged violation. Coady v. Steil, 187 F.3d 727, 731 (7th Cir. 1999).

To the extent that a court rejects an immunity claim because the standards were not clearly established, there is a risk that the scope of the underlying right may remain unclear. To ensure that legal doctrine may continue to evolve, the Supreme Court has said that courts should consider the two aspects of the immunity inquiry in sequential order, looking first at the question whether the defendants violated the plaintiff's rights, and second at whether a given right was clearly established. See, e.g., Saucier v. Katz, No. 99-1977, 2001 WL 672265, *4 (U.S. June 18, 2001); City of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). In Katz, the Court reaffirmed that "[a] court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?" 2001 WL 672265 at *4. Here, the facts are not in dispute. If the initial interpretation of the state law that the prison authorities used had been correct, Campbell would not have served too much time in prison and thus would not have been confined without penological justification; if the later interpretation was correct, then he remained behind bars too long. This reveals that Campbell's case is really about the content of Illinois law, not the federal constitution.

Nevertheless, Campbell argues, if through deliberate indifference to the requirements of state law the correctional officials kept him imprisoned too long, his Eighth Amendment rights were violated even if the additional time was not very long. Cf. Glover v. United States, 121 S. Ct. 696, 700 (2001) ("[Supreme Court] jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance."). In that sense, we believe that he has articulated a constitutional right that satisfies the first part of the Katz requirement for qualified immunity, and thus we must turn to the question of whether clearly established law prohibited the defendants' actions. We naturally do not second-guess the jury's decision to the effect that Campbell was indeed kept in prison beyond the release date dictated by state law; the remaining question is whether the individual defendants are personally liable for that violation, or if instead they are entitled to qualified immunity.

For a right to be clearly established, "[t]he contours of that right must be sufficiently clear that a reasonableofficial would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. Campbell contends that he has shown that it was clearly established that incarcerating a prisoner beyond the termination of his sentence without penological justification violates the Eighth Amendment as cruel and unusual punishment. At a general level, this proposition may be true, although the courts that have recognized this problem have been careful to note that the extended incarceration must also be the product of deliberate indifference before

a constitutional violation, as opposed to an error of state law, is implicated. See Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993); Sample v. Diecks, 885 F.2d 1099, 1108-09 (3d Cir. 1989); Haygood v. Younger, 769 F.2d 1350, 1354-55 (9th Cir. 1985) (en banc); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994). But we do not deal with generalities. Instead, we must determine whether it was clearly established that the defendants, in revoking the good conduct credits and computing a new release date after the recommitment, were violating Campbell's constitutional rights by requiring him to serve more time than state law and his sentence required. See Wilson v. Layne, 526 U.S. 603, 615 (1999) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). As Campbell points out, it is not necessary for him to point to a case saying that the revocation, under the identical circumstances, was unlawful. Instead, as the Supreme Court put it in Katz, the law is "clearly established" if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand . . . ." 2001 WL 672265 at *5 (emphasis added).

At the time of the revocation of Campbell's credits, it was not apparent that this kind of state law mistake rose to the level of an Eighth Amendment violation. The record shows that the prison officials were indeed responding to Campbell's inquiries, even if ultimately in a mistaken way. The relevant statute, 730 ILCS sec. 5/3-3-9, does not clearly establish the rules for computing release times. Section 5/3-3-9(a)(3)(i)(B) simply states that, at the time of recommitment, "[t]he Board may also order that a prisoner serve up to one year of the sentence imposed by the court which was not served due to the accumulation of good conduct credit." The statute does not expressly prohibit revocation of credits while the prisoner is serving the recommitment term.

It was not until July 30, 1990 that a state trial court definitively interpreted the statute to bar revocation of good conduct credit after

recommitment. (The appellate court questioned the Board's computation of the sentence in its June 1989 remand order, but only because it could not ascertain the Board's reason for adding the four and a half months to the six and a half year sentence. The court did not focus on or question the propriety of revoking the good conduct credits.) The trial court's decision, which appeared in July of 1990, has very little bearing on the reasonableness of the defendants' actions prior to its issuance. Furthermore, it is doubtful whether one unpublished state trial court decision can "clearly establish" the law for qualified immunity purposes. (We have held that a district court decision does not have such weight, see Anderson v. Romero, 72 F.3d 518, 525 (7th Cir. 1995), and so by parity of reasoning it is at least unclear whether a state trial court decision would carry such weight.)

Campbell also points to a January 1991 letter from the Illinois Attorney General that advised the defendants not to appeal the Circuit Court's decision. But again, this evidence has no relevance to the state of the law from 1988 through 1990, which is the time period during which the plaintiff claims he was illegally imprisoned. In any event, appeal recommendations are made for a myriad of reasons, some resting on the legal strength of the case, some on the resources of the office, some on the likely precedential value of an appellate decision, and so on. We know of no cases that hold that such a recommendation from either a state attorney general or the Solicitor General creates "clearly established law."

Campbell has therefore not shown that clearly established law prohibited the prison officials from revoking Campbell's good conduct credits after recommitment. No statute prohibited the revocation of the credits; to the contrary, the defendants were relying upon a reasonable interpretation of a state statute in revoking the credits. Although a court later found that interpretation to be incorrect, there was no case law or other controlling authority that required such a conclusion. Indeed, the defendants' interpretation had actually prevailed twice in the Circuit Court and was based upon the state legislature's grant of wide

discretion to prison officials in granting and revoking good conduct credits, see 730 ILCS sec. 5/3-6-3. Under these circumstances, defendants Groves, Peters, and Williams did not act in violation of clearly established law or with deliberate indifference to its requirements, and they are entitled to qualified immunity for the actions Campbell has challenged.

III

In his cross-appeal, Campbell challenges the grant of summary judgment in favor of Lane, O'Leary, and Mills. We review the court's grant of summary judgment de novo. See Wright v. Illinois Dep't of Corrections, 204 F.3d 727, 729 (7th Cir. 2000).

The district court dismissed the claims against this group of defendants because Campbell failed to provide any evidence that any of them had knowledge of the risk of unwarranted detention and either failed to act or took only ineffectual action, leading to the unjustified detention. See Farmer, 511 U.S. at 842–43; Sample, 885 F.2d at 1110. While we would probably agree with the district court's findings, it is also the case that these defendants were entitled to qualified immunity for the reasons we have just given. On that basis, we also affirm the summary judgment in favor of Lane, O'Leary, and Mills.

Campbell's cross-appeal did not challenge the district court's dismissal of his Fourteenth Amendment due process claims. Instead, he said only that he wanted the right to ask the district court to reconsider that ruling if the case is remanded for trial on his Eighth Amendment claims against the Lane defendants. Even if this was a proper way to contest the adverse Fourteenth Amendment ruling, which it is not, no such remand is being ordered. Thus, we have no occasion to discuss the merits of that part of the district court's decision.

IV

For these reasons, we REVERSE the jury verdict and REMAND the case to the district court to enter judgment as a matter of law in favor of Groves, Peters,

and Williams. We Affirm the dismissal of
the claims against Lane, O'Leary, and
Mills.